IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD BALTER,                          :
                                         :
          Plaintiff,                     :
                                         :
     v.                                  :     3:09-cv-1409
                                         :     (JUDGE MARIANI)
UNITED STATES OF AMERICA,                :
                                         :
          Defendant.                     :

## MEMORANDUM OPINION

## I.  Introduction

The Plaintiff in this matter, Richard Balter, was an inmate at in the United States

Penitentiary ("USP") in Allenwood, Pennsylvania from December 1999 until January of 2010. In

1997, Mr. Balter was diagnosed with macular degeneration in his right eye which resulted in the

complete loss of vision in his right eye. Sometime in 1999 or 2000, Mr. Balter was diagnosed with

macular degeneration in his left eye. The particular type of macular degeneration which afflicts Mr.

Balter is the form known as "wet" macular degeneration.

With wet macular degeneration, there occurs an abnormal growth of red blood cells

underneath the epithelium of the retina. With this disease, certain waste products are deposited

into the retina, called drusen. About ten percent of patients with macular degeneration who have

these waste products in the retina form cracks in the retina. Through these cracks, or fissures,

blood vessels then grow up from the layer underneath the retina called the choroid. These blood

vessels can leak, or bleed, and, in some cases, can burst with a resulting hemorrhage of blood into

the retina. The hemorrhage from these new and abnormal blood vessels causes inflammation, scarring underneath the retina and blindness.

Mr. Balter was afforded treatment for his wet macular degeneration by Dr. Roy Tuller of Vitreoretinal Associates P.C. ("VRA") and received steroid injections beginning in 2003 with additional steroid injections in January, March and June of 2007. During this period Mr. Balter had four active leaks of blood into his left eye but experienced no vision loss over that four year period, with his left eye's vision remaining at 20/50 to 20/60.

On August 28, 2007, Dr. Tuller saw Mr. Balter as a result of a scheduled offsite visit to Dr. Tuller's offices. Dr. Tuller told Mr. Balter that his eye was beginning to stabilize following the June 2007 injection and that he would schedule a follow-up for him. Dr. Tuller did so. That same day, Dr. Tuller's office notified the administration at the Allenwood Federal Correctional Complex ("FCC") of Dr. Tuller's request that a follow-up examination of Mr. Balter be scheduled within ten weeks of the August 28, 2007 appointment. Dr. Tuller later testified that a window of an additional seven to ten days would have been acceptable.

USP Allenwood took seven weeks, from August 28, 2007 to October 16, 2007, to notify Medical Development International Ltd., Inc. ("MDI")—an entity with which FCC Allenwood had contracted to find medical providers in the area of FCC Allenwood to provide care to inmates and to schedule the appointments for medical care for those inmates with those outside medical providers—of the need to schedule Mr. Balter's appointment with Dr. Tuller. The Bureau of Prisons ("BOP") submitted a form to MDI on October 16, 2007 which indicated that USP Allenwood wanted

2

the appointment within a one month time frame, or on or before November 16, 2007. It was MDI's responsibility to schedule the appointment according to the requested time frame indicated on the form issued by USP Allenwood to it.

Mr. Balter's appointment was scheduled for December 11, 2007, outside of the time frame requested by USP Allenwood and outside of the ten week request of Dr. Tuller.

During the same time period, Mr. Balter had been on an "automatic call-out" list which permitted him to see the optometrists who came to USP Allenwood twice a month. On September 26, 2007, an optometrist ordered that Mr. Balter was to have his intraocular pressure ("IOP") tested every month by an optometrist. In November 2007, Mr. Balter was inexplicably removed from the automatic call-out list and did not see an optometrist despite the fact that one visited USP Allenwood on November 7, November 14 and November 22, 2007. Although not qualified to treat macular degeneration, the optometrists that visited the prisoner were qualified to identify the presence of any leakage or bleed in Mr. Balter's left eye and had done so previously.

On December 5, 2007, over fourteen weeks after Mr. Balter's August 28, 2007 appointment, Mr. Balter visited Dr. Tuller's office on an emergency basis. That morning, Mr. Balter was scheduled to be seen by an optometrist, Dr. David DeRose, at USP Allenwood. Dr. DeRose identified a "fresh leak" in Mr. Balter's left eye and directed that Mr. Balter should "see Dr. Tuller ASAP." Mr. Balter was then seen that same day by Dr. Tuller's associate, Dr. Lightman, who identified a massive hemorrhage in his left eye and complete loss of central vision.

3

On July 20, 2009, Mr. Balter initiated the instant action against the Government pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 and 28 U.S.C. § 2671, *et seq.*, and MDI based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. (Compl., Doc. 1, at ¶¶ 4, 6). Mr. Balter filed timely Certificates of Merit (Docs. 5; 6) pursuant to PA. R. CIV. P. 1042.3(a). By Order dated March 28, 2011, MDI was granted leave to join Roy E. Tuller, D.O., VRA and the Retinal Group of Pa., P.C., as Third Party Defendants. (*See* Doc. 63). Thereafter, Mr. Balter and MDI resolved Mr. Balter's claim against MDI on December 6, 2012, (*see* Doc. 111), and MDI in turn agreed to voluntarily discontinue its claims against the Third Party Defendants, (*see* Docs. 91; 112).

The remaining parties, Mr. Balter and the Government, filed pretrial memoranda on January 23, 2013. (*See* Docs. 124; 126). On February 25, 2013, the parties filed a forty-nine page document titled "Amended Comprehensive Statement of Agreed Upon Facts Submitted by the United States and Richard Balter" ("CSF") containing 338 numbered paragraphs. (*See* Doc. 132). The undersigned conducted a bench trial which commenced on February 26, 2013 and ended on February 28, 2013. The Court heard live testimony from the following witnesses:

1.     Plaintiff Richard Balter, an inmate at USP Allenwood from December 1999 until January of 2010, (*see* CSF at ¶ 2);

2.     Ron Laino, Health Service Administrator over the FCC Allenwood Complex from 2005 until his retirement in 2011, (*see id.* at ¶ 42);

4

3.     Kelly Auman, Health Information Technician at FCC Allenwood between
1998 and June 2008, (*see id.* at ¶¶ 61, 63-64);

4.     Kelley DeWald, Assistant Health Services Administrator at Allenwood since
December 2003 or December 2004, (*see id.* at ¶ 88);

5.     Lisa Rey, "Medical Records Technician at USP Allenwood since 2002," (*see
id.* at ¶ 70);

6.     Dr. Matthew Goren, Mr. Balter's medical expert, (*See* Trial Tr., Goren, Day 2,
at 79:20-80:2); and

7.     Dr. Adam Paul Beck, the Government's medical expert, (*See* Trial Tr., Beck,
Day 3, at 7:11-21).

In addition, the Court received video deposition testimony from Dr. Roy Tuller, Mr. Balter's
primary ophthalmologist while he was incarcerated at USP Allenwood, (*see* Trial Dep. Tr.,
Tuller, Doc. 139, Pl.'s Ex. 37; *see also* CSF at ¶¶ 167-168), and his partner Dr. David
Lightman, who saw Mr. Balter twice in 2007—including on December 5, 2007, (*see* Trial
Dep. Tr., Lightman, Doc. 139, Pl.'s Ex. 39; *see also* CSF at ¶¶ 208, 211).

    The issues which this Court must resolve may be stated as follows:

    A. Has Mr. Balter proved that the failure of the Government and/or MDI to schedule him for
his follow-up examination by Dr. Tuller within the period prescribed by Dr. Tuller for such follow-up
examination establishes negligent conduct under principles of ordinary negligence?

B. Has Mr. Balter proved that the Government was negligent in failing to arrange for Mr. Balter to be seen at USP Allenwood by one of the two optometrists who came to USP Allenwood on November 7, 14 and 22 by removing him from the automatic call-out list?

C. If Mr. Balter has proved negligence on the part of the Government and/or MDI, did such negligence increase the risk of harm to Mr. Balter—specifically, did such negligence cause any bleed or hemorrhage which may have occurred to go unnoticed and untreated until he was seen on December 5, 2007 by Dr. DeRose, who directed that Mr. Balter be sent to an ophthalmologist "ASAP"?

D. If Mr. Balter has proved negligence on the part of the Government and/or MDI, was such negligence a factual cause of the hemorrhage Mr. Balter sustained to the macula of his left eye which caused his vision to be reduced from 20/50 to 20/400?

E. If Mr. Balter has proved negligence on the part of the Government and/or MDI and has further shown that such negligence was a factual cause of the hemorrhage in the macula of his left eye, to what damages is Mr. Balter entitled?

Because Mr. Balter has proven all of the elements of his ordinary negligence claims, judgment will be entered in favor of the Plaintiff.

## II. Findings of Fact

At the outset, the Court adopts the CSF. Many of the facts from the CSF are specifically incorporated below. The rest are incorporated insofar they are consistent with the findings below.

6

## A.    Background Facts

1.      Mr. Balter was born on October 20, 1946 and was sixty-six years old at the time of trial. (CSF at ¶ 1).

2.      On September 14, 1994, United States District Court for the District of New Jersey sentenced Mr. Balter to a term of life imprisonment. *See United States v. Balter*, Crim. A. No. 93–00536 (D.N.J. 1994), *aff'd*, 91 F.3d 427 (3d Cir. 1996).

3.      While incarcerated in USP Lewisburg, sometime between 1994 and 1996, Mr. Balter "[w]as diagnosed with macular degeneration in his right eye." (CSF at ¶ 3).

4.      In 1997, his condition rendered him legally blind in his right eye. (*See* Trial Tr., Balter, Day 1, at 25:12-14).

5.      Eventually, Mr. Balter was transferred to UPS Allenwood, where he was housed from December 1999 until January of 2010. (*See* CSF at ¶ 2).

6.      Mr. Balter "[w]as diagnosed with macular degeneration in his left eye in 1999 or 2000 while incarcerated" at USP Allenwood. (*Id.* at ¶ 4).

7.      Although he experienced several leakages between 2003 and 2007, Mr. Balter was able to maintain his baseline vision of 20/50 to 20/60. (Trial Dep. Tr., Tuller, Doc. 139, Pl.'s Ex. 37, at 31:2-10). Mr. Balter is currently incarcerated at FCI Beaumont. (CSF at ¶ 2).

7

## B.    Wet Macular Degeneration

Understanding Mr. Balter's negligence claim requires background information about the nature of macular degeneration and how medical services at UPS Allenwood are administered.

8.    "Mr. Balter has age related macular degeneration," a disease that "progresses and develops as a person ages" and can lead to vision loss. (CSF at ¶ 169; *see also* Trial Tr., Goren, Day 2, at 80:7-81:5).

9.    "[M]acular degeneration is a disease that affects a very specific part of the retina called the macula, which is the central part of the retina where central vision is processed." (Trial Tr., Goren, Day 2, at 80:7-10).

10.    "[T]here are two types of macular degeneration, . . . wet and . . . dry macular degeneration. Dry [macular degeneration] is a very slow gradual process. Everyone [with macular degeneration] will start with dry type, and perhaps 10% will progress to the wet type." (CSF at ¶ 170).

11.    "What distinguishes dry from wet [macular degeneration] . . . is the formation of new and abnormal blood vessels that occur underneath the retina within the macula. The problem with these blood vessels is that they leak and they bleed abnormally. . . . [Ultimately,] when this happens, there's fluid that accumulates underneath the retina, causes inflammation, causes damage, and . . . can be a very aggressive condition that can and does lead to blindness." (Trial Tr., Goren, Day 2, at 80:20-81:5).

8

12.     Wet, as opposed to dry, macular degeneration "is [a] more serious condition with regard to prognosis" as "[t]here . . . can be . . . sudden loss of vision" with wet macular degeneration. (CSF at ¶ 171).

13.     "[W]hen one has wet macular degeneration, dramatic leakage can happen instantly." (*Id.* at ¶ 174).

14.     "[W]et macular degeneration is an unpredictable condition." (*Id.* at ¶ 175).

15.     "Hemorrhages can happen suddenly and without warning." (*Id.* at ¶ 176).

16.     Moreover, "a person who loses central vision in one eye due to wet macular degeneration is at a 5% higher risk per year," and "[t]he risk would increase 5% every year moving forward once you lose vision in one eye due to macular degeneration." (*Id.* at ¶ 173).

17.     With wet macular degeneration, there is no treatment that can "cure the underlying disease process; [doctors] can only act or react to occurrences of leakage or bleeding" but cannot "eliminate the risk of hemorrhage, even with treatment." (*Id.* at ¶ 172).

18.     In order to prevent the progression of the disease, one treatment option is injections of "vascular endothelial growth factor inhibitors" which are "administered directly into the eye." (Trial Tr., Goren, Day 2, at 81:19-22, 82:19-21).

19.     However, "even with timely injections, a person with wet macular degeneration can have loss of central vision." (CSF at ¶ 180).

### C. UPS Allenwood's Medical Care Delivery System

20. UPS Allenwood is one of three institutions that encompass the FCC Allenwood Complex. (*Id.* at ¶ 42).

21. "In 2007, the Allenwood Complex had 4,500-5,000 inmates at any given time." (*Id.* at ¶ 43).

22. "Beginning in 2005, until the time of his retirement in 2011, Ron Laino was Health Service Administrator" ("HSA"), who oversaw the administration of medical services of the Allenwood Complex. (*See id.* at ¶ 42).

23. Below the HSA is the Assistant Health Services Administrator ("AHSA"). (*See id.* at ¶¶ 88-89). Kelley DeWald has been the AHSA since December 2003 or December 2004. (*See id.* at ¶ 88).

24. Separate from "the health service administrator, assistant health service administrator, [and] the administrative side of the medical department at the Allenwood Complex," is the Clinical Director. (*See id.* at ¶ 143).

25. "The clinical director overs[ees] all the other medical providers at the Allenwood Complex." (*Id.* at ¶ 142).

26. "Dr. Brady was clinical director at Allenwood in 2007." (*Id.* at ¶ 109).

### Mainline

27. When inmates gather to eat their meals, extra prison officials "stand main line." (*See* Trial Tr., Laino, Day 1, at 111:13-24). As Ron Laino explained,

10

The purpose of main line is two-fold. One to provide security there, since . . . there's a large amount of inmates. . . . The second one is to field any questions that the inmate might have. It's a lot easier to address a concern that the inmate may have, instead of going down the paper route in the sense of responding to inmate complaints via paper or responding to a complaint that you have to respond to for the Warden, so it's a lot easier to talk to the inmate, find out what his complaint is, and address it right then and there.

(*Id.*).

28.     "Warden Martinez or someone on behalf of the Warden, the Assistant

Warden ["AW"] or someone on behalf of the Assistant Warden, and Kelley DeWald or

someone from medical were always at mainline." (CSF at ¶ 7).

29.     "Inmates could voice complaints or bring up issues with Department heads at

main line." (*Id.* at ¶ 93).

30.     When Laino's office was located in USP Allenwood, he was primarily

responsible to stand main line. (*See* Trial Tr., Laino, Day 1, at 110:21-111:11; Trial Tr.,

DeWald, Day 2, at 11:10-20).

31.     "Mr. Laino['s] office moved to a Medium institution [within the Allenwood

Complex] sometime in 2005," and Kelley DeWald became the primary medical

representative to stand main line. (*See* Trial Tr., DeWald, Day 2, at 11:10-22).

32.     As a result, Kelley DeWald became "responsible to stand main line every

day." (*See id.*; CSF at ¶ 93).

33.     However, even after "Ron Laino's office was located at the Medium

[institution,] . . . he would visit USP Allenwood approximately once a week." (CSF at ¶ 44).

"When at USP Allenwood," Laino "would visit the segregation unit and stand mainline." (*Id.* at ¶ 45).

## Sick Call

34. "[E]ach morning at USP Allenwood, except for Wednesdays," there is what is known as "sick call." (*See id.* at ¶¶ 8, 97).

35. Sick call affords inmates an opportunity to consult a medical provider. (*Id.* at ¶¶ 8, 97, 116).

36. Sick call "is where most requests to clinical staff would happen[,] . . . includ[ing] anything from refilling medications to appointments." (*Id.* at ¶ 116). 37. "Every other day, at 6:00 in the morning when their unit is released for mainline, inmates [are permitted to] come to Health Services and sign up for sick call." (*Id.* at ¶ 97).

38. Inmates come to the window at sick call, give [the Health Services staff] their ID card[,] and they take a seat until they are called by the provider." (*Id.* at ¶ 72).

39. "There are no restrictions for inmates going to sick-call with problems," and "[i]nmates are free to go to sick-call at any time and wait to be seen by a PA [Physician Assistant]." (*Id.* at ¶¶ 85, 86).

40. "The inmates had a lot of freedom in terms of accessing health services. An inmate could come up every day if he was having a particular issue . . . ." (*Id.* at ¶ 126.) There are "[u]sually around 4 PA's on duty at sick call." (*Id.* at ¶ 99).

12

41.    "In terms of coming to sick call in the morning, if an inmate is not getting a response from one of the PAs, there is always someone else there." (*Id.* at ¶ 127).

42.    "One at a time [inmates] would come in[,] . . . be evaluated by the PA, [and] tell them their problem[s]. The PA would triage them. If their problem was serious enough, they would be seen at that time. If not, they'd be given a date at a later time to be seen by their PA." (*Id.* at ¶ 97).

43.    "It used to be that [a PA] would give [an inmate] a medical slip to come back at a different time . . . . Now, most of the time[, inmates are] put on a call out list, a piece of paper [prison officials] send around in the evening indicating when [the inmate is] supposed to go the following day." (*Id.* at ¶ 8).

## Eye Care

44.    As a general matter, "the BOP is sensitive about people having eye issues." (*Id.* at ¶ 135).

45.    According to Dr. Brady, if an inmate was at risk of going blind, "[t]he BOP would try to do everything to maintain his vision. The last thing we really want to have in the BOP is somebody that is so impaired they're going to need to have extra attention." (*Id.* at ¶ 137).

46.    "No optometrist or any eye specialist would be present at sick call." (*Id.* at ¶ 163).

13

47.    Because "[e]ye care is specialized, Dr. Brady would do eye exams and sometimes prescribe drops and things for infections, but beyond that, [BOP] would refer to optometrist[s] and ophthalmologist[s]." (*Id.* at ¶ 124).

48.    In order to receive eye care, inmates ordinarily would have to wait until an independent contractor optometrist visited USP Allenwood. (*See id.* at ¶¶ 69, 124, 163).

49.    "Dr. DeRose . . . along with Dr. Weyand would go to USP Allenwood twice a month" as independent contractor optometrists. (*Id.* at ¶ 286).

50.    However, "Dr. DeRose would make additional trips if there was an emergency." (*Id.* at ¶ 287).

51.    "Inmates were always scheduled before seeing the optometrist when they came onsite." (*Id.* at ¶ 160).

52.    Although "[t]here [we]re times when Dr. DeRose went to the institution and saw inmates that were not on the original call out list[,] . . . [so-]called add-ons," (*id.* at ¶ 296), generally, the optometrists would only see those inmates who were on the call-out list, (*id.* at ¶¶ 326-327).

53.    "Dr. DeRose and Dr. Weyand do not make the call out list." (*Id.* at ¶ 320).

54.    According to Dr. DeRose, "'[i]t's just somebody puts [inmates] on the list, and we see them.[']" (*See id.* at ¶ 320).

14

55.     "To Dr. DeRose's recollection, there was not a time between August 2007

and December 2007 where he did not see an inmate that was on the call out list." (*Id.* at ¶

331).

56.     "An inmate could not just walk in and see the optometrist at the prison." (*Id.* at

¶ 326).

57.     Instead, inmates would have to request that Kelly Auman place them on the

call out list. (*See id.* at ¶¶ 69, 334).

58.     Kelly Auman was the administrator at USP Allenwood responsible for

scheduling inmates with an optometrist. (Trial Tr., Auman, Day 1, at 159:13-20).

59.     "Kelly Auman was the health information technician that worked with the

optometrist most of the time." (CSF at ¶ 333).

60.     Typically, once Mr. Balter would make a request to see an optometrist, "Kelly

Auman would refer to any supervisor[,] and [the supervisor] would say schedule him to see

an optometrist." (*See id.* at ¶ 69).

61.     Ms. Auman was also responsible for maintaining the call out list. (*See* Trial

Tr., Auman, Day 1, at 159:23-25, 160:1-5). Decisions as to which inmates are to be placed

on the call out list are made by either "the clinician, the physician, physician assistant, or

[the health service administrator]." (See Trial Tr., Laino, Day 1, at 115:8-11).

62.     "For a long period of time[,] Mr. Balter was automatically placed on the call

out list [to be seen by an optometrist] twice a month." (*See* CSF at ¶ 338).

15

63.     By virtue of being on the automatic call out list, inmates with "certain medical diseases, macular degeneration being one," would be "seen frequently by the optometrist, just for close monitoring." (See Trial Tr., Laino, Day 1, at 115:1-7).

64.     As Mr. Balter explained, being on the automatic call out list enabled him to consult an optometrist every time one came to USP Allenwood without having to sign up for sick call the night before, like other inmates. (See Trial Tr., Balter, Day 1, at 30:12-25).

65.     However, even during sick call, inmates do "not have access to Kelly Auman's office." (See CSF at ¶ 102).

66.     "Ms. Auman's office was probably the most removed from the waiting area and main corridor where inmates were. The doors to get back there are locked[,] and an inmate would have to be escorted by someone and brought back into the department." (Id. at ¶ 117).

67.     Because "the eye room is next door to the PA's rooms, . . . [an inmate] could have gone to the PA . . . [to] be put on list to be seen." (See id. at ¶ 295).

68.     "If an inmate has requested to be placed on a call out list and has allegedly been told that he was on the call out list, the inmate has followed the appropriate steps to ensure that he will be seen by the optometrist." (Id. at ¶ 165).

69.     Ultimately, "[i]t would be the prison's responsibility to have [an inmate] on the call out list for the next clinic." (See id. at ¶ 330).

16

70.    "If Mr. Balter had complained to Dr. DeRose" that he had requested to be seen by the optometrist and that "those requests [were] not being granted, Dr. DeRose would not document that on the eye exam form or any other document." (*Id.* at ¶ 329).

71.    "If Dr. DeRose saw an inmate at USP Allenwood who had issues or complications with wet macular degeneration, he would refer the inmate to a retinal specialist or an ophthalmologist." (*Id.* at ¶ 305).

72.    There are no ophthalmologists on-site at USP Allenwood. (*See* Trial Tr., Laino, Day 1, at 122:10-16).

73.    "In the prison system, there are not a lot of options for treating wet macular degeneration. . . . [D]uring the disease process, . . . it's all out of the optometrist's hands. The optometrists refer the inmate out for treatment of wet macular degeneration." (CSF at ¶ 307).

74.    "Other than ophthalmoscopies, looking in the eye and seeing [that an inmate's] got a leak . . . [Dr. DeRose and Weyand] don't have any equipment" to treat wet macular degeneration. (*See id.* at ¶ 308).

## Utilization Review Committee

75.    In order to be scheduled for a medical appointment outside of USP Allenwood, the Utilization Review Committee ("URC") would have to first authorize the appointment. (*See id.* at ¶¶ 98, 146).

17

76.     The Clinical Director is the "chair of the URC" and has "final authority for all URC decisions." (*Id.* at ¶ 112). As Clinical Director, Dr. Brady was the chair of the URC "at [the] Allenwood Complex in August through December 2007." (*See id.* at ¶ 144).

77.     "Dr. Brady would decide what inmates could go for offsite medical appointments, but it was up to security to decide who went, when, where and why." (*Id.* at ¶ 147).

78.     "Typically, the [FCC Allenwood] complex would have 8-10 inmates going out per day, with 2 of those inmates being from USP [Allenwood], unless there was an emergency." (*Id.* at ¶ 48).

79.     "The [URC] would suggest a timeframe for medical treatment." (*Id.* at ¶ 148).

80.     "If an offsite treating physician requested a specific timeframe for follow up treatment, the utilization review committee would generally go along with that requested timeframe." (*Id.* at ¶ 149).

81.     "If an offsite doctor had an inmate patient with wet macular degeneration who needed to be seen in ten weeks for follow up, Dr. Brady would want him to be seen in ten weeks." (*Id.* at ¶ 150).

82.     "There would usually be a note that came back with the inmate patient about what happened at the offsite medical appointment." (*Id.* at ¶ 151).

83. "The note would be converted into a consultation form usually by a prison nurse or EMT around the same time the inmate patient returned to the prison." (*Id.* at ¶ 152).

84. "Lisa Rey does paperwork at URC meetings." (*Id.* at ¶ 74).

85. "A consult that was approved would be given to Mrs. Rey," the Health Information Technician. (*See id.* at ¶¶ 100, 113).

86. "Lisa Rey takes the consult forms that are approved at URC, goes back to her desk and creates an [offsite referral] ["OSR"] and[,] in doing so, . . . puts in the specific instructions on what needed to be scheduled." (*Id.* at ¶ 76).

87. "Lisa Rey would create an OSR within a day or two, at most, from receiving the consult from the URC." (*Id.* at ¶ 78).

88. Ms. Rey would then send the OSR to MDI for scheduling. (*See id.* at ¶ 113).

**MDI**

89. "In 2007[,] MDI had a contract with FCC Allenwood to provide scheduling services for USP Allenwood." (*Id.* at ¶ 38).

90. "Prior to MDI, each separate institution [in the Allenwood Complex] would have their own scheduling person." (*Id.* at ¶ 47).

91. "MDI was a middleman." (*Id.* at ¶ 46).

92.    "Under the contract with FCC Allenwood, it was MDI's responsibility to find medical providers and/or physicians in the area of FCC Allenwood to provide care to inmates." (*Id.* at ¶ 17).

93.    "In August 2007, Vida Hall was the MDI scheduler for USP Allenwood." (*Id.* at ¶ 20).

94.    "Brandon Fairbanks became the MDI scheduler for USP Allenwood in late November or early December of 2007." (*Id.* at ¶ 21).

95.    "Lisa Rey would get an e-mail from Brandon Fairbanks, an MDI scheduler, letting her know when appointments were scheduled." (*See id.* at ¶ 80).

96.    "At times[,] Lisa Rey would have to contact Brandon Fairbanks, an MDI scheduler, via e-mail and say [']I still have these consults pending, can you let me know if they are getting scheduled.[']" (*Id.* at ¶ 82).

97.    "MDI lets Lisa Rey know when an appointment is scheduled[,] and she types up the trip paper work that is routed to unit manager, HSA, AW and Warden for approval." (*Id.* at ¶ 83).

98.    For security reasons, inmates are not apprised of the dates of their appointments. (*See id.* at ¶¶ 40, 147, 220, 229).

99.    "Once the OSR is sent to MDI, Lisa Rey has no further contact with MDI about an appointment unless there are questions about it." (*Id.* at ¶ 79).

20

100.    "The OSR form is then taken with the attached consults[,] and the medical provider is called." (*Id.* at ¶ 27).

101.    "The scheduler will schedule the appointment according to the requested time frame that is indicated on the OSR form." (*Id.* at ¶ 28).

102.    "If the BOP sends MDI an OSR with a time frame that differs from the one requested by the provider, the scheduler will indicate to the provider that the institution has requested a time that differs from the provider and then its decided with the physician if they are going to be able to get the appointment within the institution's time frame." (*Id.* at ¶ 29).

103.    "The MDI schedulers are trained to provide the medical provider the pertinent information that's listed on the OSR form." (*Id.* at ¶ 30).

104.    "According to Laurie Zeller, Director of Contract Services for MDI, as a 13-year employee, the section of the OSR that sets forth 'Pertinent Information' should be communicated to the physician's office when the appointment is being set up." (*Id.* at ¶ 31).

105.    "As a routine, if a scheduler [from MDI] was told by the scheduler at the physician's office a date that was outside the requested time frame, the scheduler would have said, [']I need it sooner because the [BOP] is asking for a one month time frame.['] At that time, the physician's office would either move it up, if they could, and if their calendar was full, the first available appointment would be scheduled." (*Id.* at ¶ 33).

106.    "When the MDI scheduler has to schedule the first available appointment, but that appointment is outside the requested time frame, whether or not it would specifically

notify the BOP depends on the nature of the appointment. If the OSR is an ASAP and they can't get it scheduled within that week, they would notify the institution. If it is a two week or one month OSR and it can't be scheduled within that timeframe, then it would not be routine to specifically inform the institution." (*Id.* at ¶ 39).

107.    If MDI "could not schedule a particular appointment within a requested time frame," HSA Ron Laino "expected MDI to contact Lisa Rey and tell her." (*Id.* at ¶ 50).

108.    "In past, MDI would contact Ron Laino with scheduling conflicts." (*Id.* at ¶ 51).

109.    Mr. Laino testified that he was aware of some scheduling issues with MDI and that some inmates were not scheduled for offsite evaluations within the requested time frame made by the prison.  (Trial Tr., Laino, Day 1, at 129:24-130:8).

110.    Subsequently, MDI put a liaison onsite at USP Allenwood "to improve timeliness of scheduling." (CSF at ¶ 52).

111.    "There were situations where follow up appointments with outside providers had to be cancelled or rescheduled due to scheduling conflict issues." (*Id.* at ¶ 159).

112.    Although "[t]here was always pressure on the prison's calendar to schedule the number of offsite medical trips [,] there was usually enough availability." (*Id.* at ¶ 161).

113.    Mr. Laino testified that he believed that the ultimate responsibility for ensuring that off-site appointments are appropriately scheduled resides with the prison.  (Trial Tr., Laino, Day 1, at 140:2-5).

## VRA

114. "MDI ha[d] a contract with Vitreoretinal Associates . . . to provide ophthalmological services to inmates at USP Allenwood," including for the year 2007. (*See* CSF at ¶¶ 19, 168).

115. Dr. Tuller and Dr. Lightman are partners at VRA. (*See id.* at ¶ 208).

116. Both Dr. Tuller and Dr. Lightman are ophthalmologists that specialize in vitreoretinal diseases. (*See id.* at ¶¶ 167, 208).

117. At VRA, "[i]nmates were not scheduled on-site when they left the office, their appointment would be scheduled after they leave." (*Id.* at ¶ 229).

118. "Vitreoretinal would fax a fee slip to MDI in late 2007 after an inmate's appointment . . . to show when the doctor wanted the inmate back" in order to trigger MDI to call VRA "to make the appointment." (*See id.* at ¶¶ 230-232).

119. "The [f]ee slip would be sent to MDI on the day of the [inmate's] visit" to VRA. (*Id.* at ¶ 233).

120. Aside from the fee slip, VRA would also send MDI "doctor's notes . . . via regular mail along with a bill." (*Id.* at ¶ 234).

121. According to VRA employee Karen Weimer, VRA also faxed MDI the doctor's notes "because MDI always loses them. They always lose copies. We send them numerous copies for every visit." (*Id.* at ¶ 235).

122.    In fact, VRA subsequently "started sending everything certified mail to MDI"

due to MDI's tendency to misplace documents. (See id. at ¶¶ 235-236).

123.    "Karen Weimer knows that MDI lost documents because they [would] request

[them] over and over again." (Id. at ¶ 237).

124.    In terms of scheduling inmates,

Karen Weimer does not recall any occasions, for whatever reason, an inmate
could not be scheduled for follow-up within the time frame requested by the
physician.

According to Karen Weimer, if anyone at Vitreoretinal Associates was
contacted about scheduling an appointment and that appointment could not
be obtained within the requested time frame of the physician, they would put
them in with another doctor or consult the physician about the situation.

(Id. at ¶¶ 240-241).

125.    "If a patient needed to be seen on an urgent basis, both Dr. Tuller and Dr.

Lightman would double book." (Id. at ¶ 239; see also id. at ¶ 279).

126.    "An inmate could be seen at Vitreoretinal Associates on any day as long as

there was a doctor available in an office that the prison was able to take the inmate to." (Id.

at ¶ 253).

127.    Although "no one in particular [at VRA] was tasked with the responsibility to

schedule inmate appointments," "Valerie Cupp and Holly DeWald would be primarily

responsible for scheduling appointments." (See id. at ¶¶ 246-247).

128.    "All front desk staff members at Vitreoretinal Associates were aware of the

protocol for scheduling appointments." (Id. at ¶ 257).

24

129. Moreover, "everyone at Vitreoretinal Associates who answers the phone is trained to ask the caller, whether it is a patient, MDI, or a prison, if the patient is experiencing any specific problems." (*Id.* at ¶ 242).

130. According to Valerie Cupp, when scheduling an appointment for an inmate, you would first, get into the patients account, look at their last medical record, look to see when the physician wanted them back at that time, ask them if that is the appointment they are scheduling or is the inmate having a problem that they need to be seen sooner. . . .

The schedulers at Vitreoretinal Associates have a responsibility to go back to the physician who requested the follow-up and notify them that they cannot get the patient scheduled within that time frame and ask the physician what they want to do, and Valerie Cupp recalls this scenario happening.

(*Id.* at ¶¶ 254, 268).

131. "[N]ormally, an appointment could be made for an inmate on the day MDI called. In most cases, [an] appointment is made relatively quickly." (*Id.* at ¶ 273).

132. When scheduling conflicts occurred "on the prison's end regarding the ability to schedule a follow-up within the requested time frame, the staff at VRA is trained to go to the doctor to see what they should do." (*Id.* at ¶ 281).

133. "In Dr. Tuller's view, he believes his staff should notify him when a follow-up appointment cannot be scheduled within the requested timeframe;" and, "[t]ypically, Dr. Tuller is made aware when a follow-up appointment with an existing patient cannot be scheduled within the requested timeframe." (*See id.* at ¶¶ 196-197).

134.    "According to Valerie Cupp, there were fewer scheduling conflicts before MDI became involved in the scenario of scheduling inmate patient appointments." (*Id.* at ¶ 285; *see also id.* at ¶ 283).

135.    Indeed, "Valerie Cupp does not recall not being able to get an inmate seen during the requested time for follow-up appointments when she was dealing directly with the prison." (*Id.* at ¶ 284).

### D.    2003-August 27, 2007

136.    After being "diagnosed with macular degeneration in his left eye in 1999 or 2000," (*id.* at ¶ 4), Mr. Balter first required injections for his left eye in 2003, (*see id.*at ¶ 178).

137.    "Dr. Tuller gave Mr. Balter two injections in 2003." (*Id.*)

138.    "According to Dr. Tuller, [when] Mr. Balter had experienced acute problems with his eye in the past, . . . he was sent out to see Dr. Tuller in a timely fashion." (*Id.* at ¶ 206).

139.    "[I]n July 2003[,] Mr. Balter noticed a change in vision that morning, and that very day that he told prison staff that he began experiencing dimming of his vision he was sent out to see Dr. Tuller." (*Id.* at ¶ 207).

140.    Such timely treatment is consistent with the medical care Mr. Balter received prior to 2005, when Ron Laino was the primarily medical representative to stand main line.

(See id. at ¶ 206; Trial Tr., Laino, Day 1, at 110:21-111:11; Trial Tr., DeWald, Day 2, at 11:10-20).

141.   "There were times at mainline where [Mr.] Balter would tell Ron Laino he feels a bleed in his eye and [Mr.] Laino would address the issue right then." (See CSF at ¶ 54).

142.   "On a couple occasions[, Mr. Laino] sent Mr. Balter out for medical care the same day that he addressed him at mainline." (Id. at ¶ 55).

143.   Mr. Balter would inform Mr. Laino that he felt leakage in his eye, and Laino would "rush" Mr. Balter "to see Dr. Tuller within the hour." (Id. at ¶ 12).

144.   Mr. Laino testified that Mr. Balter did not "cry wolf" and that he could not recall "any instance" where Mr. Balter was mistaken when he had complained of a leakage. (Trial Tr., Laino, Day 1, at 116:18-24).

145.   On another occasion, when Mr. Balter was experiencing "chest pains and sweating and aching in [his] arm," he insisted that a prison paramedic contact Mr. Laino. (See CSF at ¶ 11; Trial Tr., Balter, Day 1, at 31:17-32:17). Mr. Laino ensured that Mr. Balter was rushed to a local hospital. (See CSF at ¶ 11). In this instance, Mr. Balter had sustained a "massive heart attack." (Trial Tr., Balter, Day 1, at 32:13-14).

146.   Dr. Tuller also testified that Mr. Balter's medical complaints were credible, stating that he was "very aware of any problem with his vision" and that Mr. Balter's beliefs about his vision were typically confirmed by subsequent exams. (Trial Dep. Tr., Tuller, Doc. 139, Pl.'s Ex. 37, at 14:15-23).

147.    Mr. Laino further testified that if Mr. Balter had approached him in late 2007 complaining of a leak in his eye, Mr. Laino would have referred Mr. Balter out to Dr. Tuller or Dr. Lightman "within an hour," or at least "as soon as possible." (See Trial Tr., Laino, Day 1, at 116:13-117:8).

148.    In 2004 through 2006, Mr. Balter required no injections. (CSF at ¶ 178). His vision in his left eye remained stable at 20/50 to 20/60 during this time. (Trial Dep. Tr., Tuller, Doc. 139, Pl.'s Ex. 37, at 31:2-10).

149.    However, on January 23, 2007, Dr. Tuller identified leakage in Mr. Balter's left eye. (See Pl.'s Feb. 20, 2007 Letter to Dr. Tuller, Doc. 139, Pl.'s Ex. 3.5; Dr. Tuller's March 6, 2007 Letter to Pl., Doc. 139, Pl.'s Ex. 3.6). During his January 23, 2007 appointment, Mr. Balter received an Avastin injection in his left eye. (Trial Dep. Tr., Tuller, Doc. 139, Pl.'s Ex. 37, at 30:4-8).

150.    On March 20, 2007, Mr. Balter met again with Dr. Tuller. (See CSF at ¶ 179). In his notes, Dr. Tuller indicated, "There has been progression of the subretinal disease in the left eye. In the past, there has been a nice response to intravitreal Kenalog and I will repeat this." (Pl.'s Mar. 20, 2007 Med. R., Doc. 140, Def.'s Ex. 1, at 52; see also CSF at ¶ 179). Mr. Balter received Kenalog injection in his left eye on March 20, 2007. (Pl.'s Aug. 28, 2007 Med. R., Doc. 139, Pl.'s Ex. 3.9).

151.    As a follow up to his March 20, 2007 appointment, Mr. Balter visited Dr. Tuller on June 4, 2007. (Pl.'s June 6, 2007 Med. R., Doc. 140, Def.'s Ex. 1, at 53). Dr. Tuller

noted, "Richard does appreciate improvement in vision over the past 2 1/2 months. He comments that he feels the leakage has stopped but there is decreased vision due to cataract." (*Id.*) During this appointment, Mr. Balter received another Kenalog injection. (*Id.*)

152. Following his June 4, 2007 appointment, Dr. Tuller directed that Mr. Balter be returned in six to eight weeks. (*Id.* at 54). However, Mr. Balter complained that his vision became blurrier after the June 4, 2007 injection and was scheduled to see Dr. Lightman on June 25, 2007. (*Id.* at 55).

153. During his June 25, 2007 appointment, Dr. Lightman indicated that Mr. Balter was "concerned because [his vision] usually clears up quickly after the injection." (*Id.*) Dr. Lightman found no significant change in the subretinal hemorrhage and directed that Mr. Balter "[f]ollow-up with Dr. Tuller as scheduled." (*Id.*) "On the June 25, 2007 appointment with Dr. Lightman, Mr. Balter had active wet macular degeneration." (CSF at ¶ 222).

154. During this period, Mr. Balter was on the automatic call out list and was seen by an optometrist twice a month. (*See id.* at ¶ 338). "According to Dr. DeRose, Mr. Balter was in the clinic a million times. . . . [W]e saw Mr. Balter so many times, it was like every clinic for two years. . . . [S]omebody wanted us to see Mr. Balter a lot, so we saw him a lot." (*Id.* at ¶¶ 290-92). In fact, Mr. Balter was in clinic so often that Dr. DeRose speculated that "Mr. Balter could recognize my footsteps coming down the hall." (*Id.* at ¶ 293).

### E.      August 28, 2007 Appointment

155.    "Mr. Balter's appointment of [August 28, 2007] was created on [August 14,

2007]." (*Id.* at ¶ 275).

156.    On August 28, 2007, Dr. Tuller saw Mr. Balter and told him that "his eye was

stable and that he would schedule a follow-up for him." (*Id.* at ¶¶ 5). Dr. Tuller ordered that

Mr. Balter return in ten weeks. (*Id.* at ¶ 181).

157.    During his trial deposition testimony, Dr. Tuller explained his rationale for the

ten week follow-up, stating that

> . . . the activity that [Mr. Balter] was having [was] beginning to stabilize, I just
> felt that the . . . two and a half month follow-up would be appropriate. There
> were periods where . . . I was following him at five or six-month intervals when
> things were very quiet, and then more closely when there was active leakage
> that needed closer monitoring. And I think that this point, with a two and a half
> month follow-up, I felt that things were beginning to stabilize again.

(Trial Dep Tr., Tuller, Doc. 139, Pl.'s Ex. 37, 33:6-34:17).

158.    "According to Dr. Tuller, if a patient is stable, has no complaints, then

certainly a week on either side, a week and a half on either side, so that might give you a, in

a sense, a two and a half month follow-up, perhaps a 3 week zone around that requested

appointment. I don't expect it to be 10 weeks to the day.  But that's the time frame that I am

looking for." (CSF at ¶ 185).

159.    As of August 28, 2007, Dr. Tuller "had no plan to provide an injection to Mr.

Balter at the 10 week follow-up." (*See id.* at ¶ 186).

### F.     October 16, 2007

160.     "The medical record from the August 28, 2007, appointment with Dr. Tuller was attached to the OSR submitted to MDI by Lisa Rey on October 16, 2007." (*Id.* at ¶ 23).

161.     "The October 16, 2007, OSR submitted to MDI had the one month box checked indicating that USP Allenwood wanted the appointment within a one month time frame." (*Id.* at ¶ 24). "The one month begins to run from the day the OSR is submitted to MDI." (*Id.* at ¶ 25). "That means that USP Allenwood wanted Mr. Balter's appointment scheduled on or before November 16, 2007." (*Id.* at ¶ 26).

162.     "According to Laurie Zeller, Director of contract services for MDI, Richard Balter's appointment with Dr. Tuller was not scheduled promptly by MDI[,] where MDI was provided with the OSR on October 16, 2007, and MDI did not schedule the appointment until 20 days later on November 5, 2007." (*Id.* at ¶ 36).

163.     Mr. Balter's "appointment was scheduled by Vida Hall for December 11, 2007 at 1:00 p.m." (*Id.* at ¶ 34). "The December 11, 2007 appointment would be outside of the timeframe requested by USP Allenwood." (*Id.* at ¶ 35).

164.     Dr. Brady, Clinical Director of USP Allenwood in 2007, could not explain why Mr. Balter was not timely scheduled for a follow-up with Dr. Tuller. (*See id.* at ¶¶ 107, 156).

165.     "According to Dr. Brady[,] the 10-week follow-up for Mr. Balter would be like kind of a non-contested . . . no brainer.  We would just do it." (*Id.* at ¶ 125).

31

166.   "Wet macular degeneration is a condition that should be followed by an ophthalmologist, and whatever they're suggesting in terms of follow up, would make sense to comply with." (*Id.* at ¶ 141).

167.   "If an offsite doctor had an inmate patient with wet macular degeneration who needed to be seen in ten weeks for follow up, Dr. Brady would want him to be seen in ten weeks." (*Id.* at ¶ 150).

168.   "Dr. Brady does not know why it took from August 28, 2007, the day of the consultation sheet, until October 16, 2007, to get from the consultation sheet step to being referred offsite to be scheduled." (*Id.* at ¶ 156).

169.   Mr. Laino, who oversaw the administration of medical services at FCC Allenwood during 2007, testified that he was unsure as to why it took the prison seven weeks to process a consultation sheet that ultimately provided the information to MDI to schedule an offsite appointment. (*See* Trial Tr., Laino, Day 1, at 127:11-16).

170.   Mr. Laino further testified that such a lengthy time frame to schedule an appointment is unusual.  (*Id.* at 127:17-20).

171.   In addition, Mr. Laino testified that he was aware of some scheduling issues with MDI and that some inmates were not scheduled for offsite evaluations within the requested time frame made by the prison. (*See id.* at 129:24-130:8).

172.   Likewise, AHSA Ms. DeWald testified that she did not know why it took over seven weeks to create an OSR for Mr. Balter with MDI. (*See* Trial Tr., DeWald, Day 2, at

9:21-22). Moreover, she could think of no other instance in which such a time period elapsed while attempting to schedule other prisoners. (*See id.* at 9:23-25).

### G.    November 2007

173.    "For a long period of time[,] Mr. Balter was automatically placed on the call out list [to see an optometrist] twice a month." (CSF at ¶ 338).

174.    Consistent with being on the automatic call out list, "Mr. Balter was seen by Dr. DeRose or Dr. Weyand on September 11, 2007, September 26, 2007, [and] October 17, 2007." (*See id.* at ¶ 322).

175.    During the month of November 2007, an optometrist, either Dr. DeRose or Dr. Weyand, visited USP Allenwood on three occasions—November 7, November 14, and November 22. (*See* Trial Tr., Balter, Day 1, at 90:2-6).

176.    However, Mr. Balter's optometry appointments inexplicably ceased as of October 17, 2007. (Auman June 4, 2008 Note, Doc. 139, Pl.'s Ex. 2).

177.    As a result, Mr. Balter was unable to see an optometrist for several weeks, including the entire month of November 2007. (*Id.*).

178.    Moreover, Dr. DeRose's September 26, 2007 exam sheet ordered that Mr. Balter have his IOP tested every month by an optometrist and required Mr. Balter to see a "retinal specialist on a regular basis." (*See* Pl.'s Sept. 26, 2007 Med. R., Doc. 139, Pl.'s Ex. 1.12).

179.    Mr. Laino testified that he could not explain why Dr. DeRose's written request that Mr. Balter be evaluated at least every month by a retinal specialist was not complied with, and Mr. Laino expressed further concern that the prison failed to comply with orders from physicians requesting follow-ups for Mr. Balter. (*See* Trial Tr., Laino, Day 1, at 154:20-25, 155:1-14).

180.    Likewise, Ms. DeWald could not recall why Dr. DeRose's request that Mr. Balter be monitored by an optometrist every month was disregarded. (*See* Trial Tr., DeWald, Day 2, at 31:3-11).

181.    Ms. DeWald testified that orders from Dr. DeRose are generally followed. (*See id.* at 32:10-13).

182.    Finally, Ms. Auman testified that she did not know why Mr. Balter was not seen by the optometrist between October 17, 2007 and December 5, 2007, even though his "eye exam sheet" required such appointments. (*See* Trial Tr., Auman, Day 1, at 168:1-169:24, 186:5-11).

183.    At trial, Mr. Balter testified that in early November 2007 he felt that there was a leakage in his left eye. (*See* Trial Tr., Balter, Day 1, at 46:1-6).

184.    By "the middle of the month," Mr. Balter began experiencing "a little blurriness in the eye . . . ." (*Id.* at 46:23-47:2).

185. According to Mr. Balter, he "went to Ms. DeWald several times at main line" complaining of these symptoms and the fact that he was no longer on the automatic call out list to see an optometrist. (Id. at 44:21-45:6).

186. Further, Mr. Balter testified that he made similar complaints to his physician assistant at the prison, Ms. Holtzapple, (id. at 38:11-17), as well as Ms. Auman and Ms. Rey, (id. at 50:9-21).

187. Mr. Balter also maintained that he made oral complaints to Warden Ricardo Martinez and assistant warden. (Id. at 70:4-11).

188. Mr. Balter voiced these complaints on a nearly daily basis between November 4, 2007 and December 4, 2007. (Id. at 70:12-71:5).

189. According to Mr. Balter, when he "went to the Warden, the AW, . . . they told [him] to see Medical." (Id. at 34:18-35:4).

190. When he went to Medical, Ms. DeWald "was a little annoyed" and told Mr. Balter, "You're being scheduled." (See id. at 35:3-6).

191. Mr. Balter protested, allegedly stating, "Come on, Ms. DeWald, what do you mean I'm being scheduled? I'm not seeing the eye doctor. When is he coming in? He's here at least twice a month, and . . . I'm still not seeing him. This is getting worse. Could you get me to Dr. Tuller? Where is Mr. Laino?" (Id. at 35:6-10).

192.    According to Mr. Balter, Ms. DeWald's response "was basically, [']Balter,

you're scheduled. Keep it up and you'll end up in SHU, [the] Special Housing [Unit].'" (Id. at

35:10-12).

193.    Mr. Balter further testified that when he went to Medical and approached Ms.

Auman, who scheduled inmate appointments with the optometrist, her response was "We'll

take care of it and you'll be scheduled." (See id. at 33:15-34:5).

194.    Balter testified when he subsequently complained, "the famous words were,

[']You're scheduled.[']" (See id. at 46:25-47:3).

195.    Although Mr. Balter was unable to see an optometrist during the month of

November, Mr. Balter did see Dr. Pigos, a Medical Officer at FCC Allenwood in late 2007"for

a chronic care appointment on November 16, 2007." (See CSF at ¶¶ 106, 110). "The

appointment was related to all of his chronic problems, including macular degeneration." (Id.

at ¶ 110). "Regarding his [m]acular degeneration, Dr. Pigos remembers asking Mr. Balter

how things were going, and he said he was following up with the eye doctors and he didn't

have any complaints." (Id. at ¶ 111).

196.    On cross-examination, Mr. Balter was asked why he did not complain to Dr.

Pigos on November 16, 2007, regarding the worsening of his condition and the alleged

failure of the prison to send Mr. Balter to a specialist. (See Trial Tr., Balter, Day 1, at 79:1-

7). Mr. Balter responded that he did not raise the issue with Dr. Pigos because "Dr. Pigos

and any medical doctor in there had told me numerous times they do not go over or discuss

36

the eye, they do not have the knowledge they do not have the equipment they do not have the ability." (*Id.* at 79:13-16).

### H.    December 5, 2007

197.    Mr. Balter was scheduled to see Dr. Tuller on December 11, 2007 at 1:00 P.M. (*See* CSF at ¶ 34).

198.    On December 5, 2007, Mr. Balter sustained a "large hemorrhage" in his left eye. (*See* CSF at ¶ 217).

199.    According to Mr. Balter, when he woke up on the morning of December 5, 2007, he noticed a significant decrease in his vision. (*See* Trial Tr., Balter, Day 1, at 47:12-24). Mr. Balter described that "it was terrible. . . . I could see only shadows." (*Id.* at 47:23-24).

200.    "Dr. DeRose treated Mr. Balter on December 5, 2007." (CSF at ¶ 310).

201.    "Dr. DeRose believes that he was most likely at the institution on December 5, 2007, for one of the regularly scheduled days." (*Id.* at ¶ 328).

202.    "When Mr. Balter was seen by Dr. DeRose on December 5, 2007, Dr. DeRose noted . . . . 'He's got macular degeneration on the right [eye], and he has a fresh leak on the left and his pressures were normal.'" (*Id.* at ¶ 300).

203.    "According to Dr. DeRose, fresh leak means currently bleeding, and means the wet macular degeneration is active." (*Id.* at ¶ 301).

37

204.    "During the December 5, 2007 optometry appointment, Dr. DeRose indicated that Mr. Balter should 'see Dr. Tuller ASAP.'" (*Id.* at ¶ 311).

205.    Mr. Balter testified that he explained to Dr. DeRose not only what his condition was that day but also that he had been trying to see him for the past month. (*See* Trial Tr., Balter, Day 1, at 102:12-15).

206.    "If Mr. Balter had complained to Dr. DeRose of Mr. Balter requesting to [be] seen and those requests not being granted, Dr. DeRose would not document that on the eye exam form or any other document." (CSF at ¶ 329).

207.    "Dr. DeRose does not recall anything specific about the December 5, 2007, appointment with Mr. Balter," nor does he "recall anything Mr. Balter said to him" at that appointment. (*See id.* at ¶¶ 315-316.)

208.    VRA was contacted, and "Valerie Cupp made the December 5, 2007 appointment . . . that very same day." (*Id.* at ¶ 276).

209.    As a result, Mr. Balter was examined by Dr. Lightman on December 5, 2007. (*See id.* at ¶ 211).

210.    "Dr. Lightman has no independent recollection of Mr. Balter. Dr. Lightman's only recollection of Mr. Balter is what is documented in the medical notes." (*Id.* at ¶ 209).

211.    As Dr. Lightman's notes indicate, "Mr. Balter suffered a significant decrease in vision between June 25, 2007, and December 5, 2007." (*See id.* at ¶ 221).

212. When Dr. Lightman last saw Mr. Balter on June 25, 2007, his vision in his left

eye was 20/60. (Pl.'s June 25, 2007 Med. R., Doc. 139, Pl.'s Ex. 3.8.5).

213. On December 5, Mr. Balter's visual acuity dropped to 20/400. (Trial Dep Tr.,

Lightman, Doc. 139, Pl.'s Ex. 39, at 15:17-16:22).

214. During his trial deposition testimony, Dr. Lightman explained Mr. Balter's vision

loss in practical terms, stating that it was "about seven times worse" on December 5 than it

was on June 25. (See id. at 16:13-19). Dr. Lightman further explained,

> People can generally read with larger print with [20/60] vision. You can drive a
> car during daylight hours with 20/70 vision or better. . . .
>
> [S]omebody with 20/400 vision could just see the big E on the chart. . . .
> Navigation would be possible. Reading would be very difficult without low
> vision devices, including magnification or a real bright light.

(Id. at 14:3-5, 16:21-17:3).

215. Mr. Balter's vision loss was the result of a "large hemorrhage." (See CSF at ¶

217; see also id. at ¶ 13).

216. "According to Dr. Lightman, you can't determine the timing of the leak by the

size of the hemorrhage." (Id. at ¶ 218.)

217. Further, "[a]ccording to Dr. Lightman, usually when you see a hemorrhage

that big, they're usually of sudden onset, but it is not a definite." (Id. at ¶ 219). "The bleed

could have happened unpredictably and suddenly on December 5, 2007." (Id. at ¶ 195.)

218. In this instance, Dr. Lightman ordered photographs of Mr. Balter's left eye.

(See Dec. 5, 2007 Color Eye Study, Doc. 139, Pl.'s Ex. 9.1).

219.    According to Dr. Lightman, although the photographs cannot be used as a basis for "pinpointing" when Mr. Balter's eye began to leak, he acknowledged that the "hemorrhage could have began weeks before December 5th." (Trial Dep Tr., Lightman, Doc. 139, Pl.'s Ex. 39, at 24:4-20).

220.    Moreover, Dr. Tuller testified that the photographs reveal "a dark area of blood [that is] surrounding a more tan area[,] . . . which looks like [it] has probably been there for a matter of weeks because the blood dehemoglobizes, so . . . this probably isn't completely fresh." (Id. at 24:11-20).

221.    "Dr. Lightman doesn't recall Mr. Balter telling him at his appointment on December 5, 2007, that he had been experiencing vision loss in his left eye since late October and through November of 2007 and that he was making complaints with the [prison staff] but they ignored him. Had Mr. Balter told him this, it is something Dr. Lightman would have documented in his notes." (CSF at ¶ 212).

222.    "According to Dr. Lightman[,] the length of time someone is experiencing symptoms in the context of macular degeneration is relevant to further treatment and you would document that information in your note." (Id. at ¶ 213).

223.    Dr. Lightman got the "information contained in [his] note from December 5, 2007 . . . from . . . Mr. Balter." (Id.at ¶ 216).

224. "On December 5, 2007, Mr. Balter told Dr. Lightman that today he noted worsening of his vision in left eye and saw Dr. DeRose, . . . who noted leakage left eye." (*Id.* at ¶ 214).

225. "Dr. Lightman's general practice was to ask a patient about the details surrounding the length of time he experienced symptoms." (*Id.* at ¶ 215).

226. During his trial deposition testimony, Dr. Lightman acknowledged that "[i]t's possible" that "Mr. Balter relayed to [him] that he had symptoms maybe several days before." (Trial Dep. Tr., Lightman, Doc. 139, Pl.'s Ex. 39, at 19:18-24). Dr. Lightman further noted that the medical "histories that we take are not exhaustive. We try to say them as succinctly as we can." (*Id.* at 19:24-20:1).

227. Dr. Lightman testified that his medical notes capture only "the highlights of [a patient's] chief complaint . . . rather than a day-by-day description of what he's experienced." (*Id.* at 20:5-12).

### I.     June-July 2008

228. "The vision in Mr. Balter's left eye worsened as a result of another hemorrhage in June of 2008." (CSF at ¶ 14).

229. Mr. Balter testified that after the December 5, 2007 hemorrhage he "could see only shadows." (*See* Trial Tr., Balter, Day 1, at 47:23-24).

230. "In June, 2008, Mr. Balter's entire left eye filled up with blood, there was no light." (CSF at ¶ 13). Mr. Balter further testified that

41

In June 4, I went up to see Dr. DeRose and I told him that my eye was hemorrhaging. . . . And he said, ["]Your eye is starting to hemorrhage.["] He said, ["]We'll get you to see Dr. Tuller right away, I'll let Ms. DeWald know.["] . . . [W]e expected it to be quick[,] because it was hemorrhaging[,] . . . [but] I then didn't go to see Dr. Tuller . . . for twelve days . . . . When I got to see Dr. Tuller on that day, my eye had filled up with [blood] . . . .Dr. Tuller then told me the only thing that could be done was he had to do a vitrectomy on me, and that was done in July.

(Trial Tr., Balter, Day 1, at 62:7-63:1).

231.    On June 16, 2008, "Dr. Tuller noted 'Interval History' Richard comments that he had a sudden loss of vision in the left eye on June 10, 2008." (CSF at ¶ 190).

232.    On the same date, "Mr. Balter had a severe decrease in vision secondary to progression of his disease. At that examination, there was bleeding into the center of the eye." (Id. at ¶ 191).

233.    Further, on June 16, "there had been further subretinal bleeding, which led to blood in the center of the eye resulting in a severe decrease in vision." (Id. at ¶ 192).

234.    "Dr. Tuller believes the severe loss of vision on [June 18, 2008] was an isolated and separate event. The event from December was stable with the treatment around that visit, and the June event was further progression of the disease." (Id. at ¶ 202).

235.    On July 3, 2008, "Dr. Tuller operated on Mr. Balter and noted: [']Surgery note (Tuller 090) Operative findings: Most recently there has been hemorrhagic pigment epithelial detachment of the left eye with breakthrough vitreous hemmorhage.  Talking about June event.  There was subretinal hemorrhage as well as extensive peripheral scarring due to previous subretinal hemorrhage in 2008.  The macular degeneration is very advanced

42

with poor prognosis for recovery of vision.  The retina is nonfunctioning and scarred, so there is really no hope for recovery of vision.[']"  (Id. at ¶ 193).

### J.      Expert (Medical) Testimony

#### Dr. Goren

236.    Dr. Matthew Goren, Mr. Balter's medical expert, testified that persons experiencing wet macular degeneration should be able to recognize symptoms that would indicate a change in status of their condition. (See Trial Tr., Goren, Day 2, at 87:6-16).

237.    Dr. Goren further testified that when certain symptoms exist, such as a distortion in vision, it is important to see the doctor as soon as possible. (Id. at 87:9-88:4).

238.    Dr. Goren opined that an optometrist should be able to identify a leak in the eye of a patient diagnosed with wet macular degeneration. (Id. at 98:18-21).

239.    Dr. Goren also provided testimony that patients who complain of an "acute visual change" should be seen by a doctor within twenty-four hours. (Id. at 98:1-17).

240.    With regard to Mr. Balter's alleged complaint's that his eye was leaking, Dr. Goren testified that if Mr. Balter "requested or had notified prison staff that he believed he had a leak and he requested to see the optometrist or the ophthalmologist," such a request would be medically appropriate. (Id. at 99:6-11).

241.    Dr. Goren opined that the complaints that Mr. Balter made in November 2007 concerning blurry vision and that he had to squint to read when coupled with Mr. Balter's

medical history should have compelled prison staff to ensure that Mr. Balter was seen by an optometrist within twenty-four hours, or forty-eight at most. (Id. at 101:21-102:12).

242. Dr. Goren's testimony was that a delay beyond forty-eight hours would "increase the risk of not being able to prevent the harm from occurring," which includes a loss of vision. (Id. at 102:1-10).

243. With regard to the ten week window for a follow-up with Dr. Tuller, Dr. Goren testified that a timely follow-up with Dr. Tuller would "likely have resulted in discovering some continual leakage." (See id. at 110:8-12).

244. Dr. Goren further testified that irrespective of Mr. Balter's recognition of symptoms of a possible leakage, the failure to abide by Dr. Tuller's request for a ten week follow-up increased the risk of harm to Mr. Balter. (Id. at 113:17-22).

245. Dr. Goren opined that both the failure to schedule a timely follow-up and a failure to address Mr. Balter's complaints regarding symptoms of a leak increased the risk of harm to Mr. Balter. (See id. at 130:1-9).

246. Dr. Goren testified that there was a significant leakage on December 5, 2007, but that there was "a process going on, prior to that day." (See id. at 134:11-21).

247. Dr. Goren testified that, to a reasonable degree of medical certainty, there was an ongoing leakage problem. (Id.)

44

248.     While Dr. Goren agreed that there was a "sudden, massive hemorrhage on December 5, 2007," (id. at 144:12-18), he also stated there was a "leakage" prior to that December 5, 2007 hemorrhage, (id. at 144:19-145:6).

249.     Dr. Goren testified that "it's unreasonable to assume that all of a sudden [Mr. Balter] had a completely brand new event that was unrelated to what was going on over the past seven or so years." (Id. at 142:20-143:2).

250.     Again, Dr. Goren testified that the leaking was chronic, even if it was not always constant. (See id. at 142:17-143:2).

251.     Dr. Goren also testified that although he believed the leaking was chronic, there was a sudden, "very seminal" event that occurred on December 5, 2007. (See id. at 144:17-18).

252.     Dr. Goren opined that if there were leakage in Mr. Balter's eye as he believed there was based on the tan coloration in the photograph of Mr. Balter's eye after the hemorrhage, (see Dec. 5, 2007 Color Eye Study, Doc. 139, Pl.'s Ex. 9.1), that there was "a period of intervention" which provided "an opportunity" for treatment, (Trial Tr., Goren, Day 2, at 145:14-17).

253.     Dr. Goren testified that a photograph of the bleed suggested that the blood may have been in Mr. Balter's eye for an extended period, and that it indicates an ongoing leakage. (Id. at 144:22-145:6).

254.     Dr. Goren was then questioned as follows:

45

Q:      Could that have prevented this massive event on December 5?

A:      I believe so.

Q:      What makes you believe that?

A:      Well, anything is just a general principle that things are more
        effectively treated at earlier stages than late stages, that's true with
        everything.

(*Id.* at 145:18-24). Before Dr. Goren concluded his testimony, the following exchange

occurred:

THE COURT:          . . . is it your testimony that had Mr. Balter been seen, in
                    accordance with the August 28, 2007 suggestion or
                    directive, however you want to characterize it, that he be
                    seen in 10 weeks, that that would have avoided the eye
                    hemorrhage of December 5, had he been seen? Is that
                    your testimony?

THE WITNESS:        No, Your Honor, I can't say with certainty that that's the
                    case. But I can say that he would have had a far better
                    chance of a favorable outcome, but, no, I can't say with
                    100 percent certainty. . . .

MR. MOWRY:          Doctor, with the question directed from the Judge, is it
                    correct you're saying that, although, you can't determine
                    what would it have shown, if that 10 weeks had been
                    complied with, as Drs. Tuller and Lightman have
                    testified, that nobody knows what it would have shown?
                    Is it your position that the failure to have that requested
                    follow-up, that it increased the risk of harm to Mr. Balter?

THE WITNESS:        Yes, sir.

(*Id.* at 150:22-151:11, 152:1-9).

46

## Dr. Beck

255.    Defendant offered the expert testimony of Dr. Adam Paul Beck ("Beck").

256.    Dr. Beck testified that patients suffering from age-related wet macular degeneration can have a stable eye exam and then suffer a sudden leak or hemorrhage that causes permanent vision loss the next day. (Trial Tr., Beck, Day 3, at 11:3-7).

257.    Dr. Beck testified that there is no treatment available to "prevent macular degeneration from progressing." (Id. at 11:16-19.)

258.    Dr. Beck's testimony was that there is no procedure available to prevent sudden hemorrhages, but that doctors are only able to react to them. (Id. at 11:20-12:2).

259.    Specifically, Dr. Beck stated that injections of Kenalog, Avastin, or Lucentis do not eliminate the risk of hemorrhages. (Id. at 12:7-9).

260.    With regard to Mr. Balter's case, Dr. Beck testified that large hemorrhages, such as the one experienced by Mr. Balter on December 5, 2007, are usually sudden. (Id. at 16:9-12).

261.    Dr. Beck testified that the leak experienced by Mr. Balter on December 5, 2007 was "most likely within a reasonable degree of medical certainty, a sudden onset." (Id. at 16:23-17:2).

262.    Dr. Beck opined that a photograph of the bleed suggested that it was a sudden occurrence. (Id. at 17:10-11).

47

263. Dr. Beck testified that he agreed with Dr. Tuller's testimony that even the

receipt of timely injections does not necessarily stop a patient with wet macular

degeneration from suffering a loss of central vision. (*Id.* at 17:18-22).

264. Dr. Beck testified that the fact that Mr. Balter was not seen in November

2007 "had no bearing" on his suffering a loss of central vision. (*See id.* at 18:15-16).

265. The Court questioned Dr. Beck concerning the purpose of the eye injections

and the role they play in wet macular degeneration.

THE COURT: As I understand your testimony, when we talk about wet macular degeneration we are essentially speaking of the growth of red blood cells under the epithelium of the retina?

DR. BECK: Uh-hum.

THE COURT: And then apparently there's a [fissure] in the retina and the blood cells protrude and ultimately if they hemorrhage you have the event of December 5th in this case?

DR. BECK: Uh-hum.

THE COURT: Now let me take you out of your specialty for a moment and ask you, I want to try to compare this or, at least, attempt to draw an analogy between that process that I just described and what we sometimes see, in connection with aneurisms.

An artery has a bulge in it, the bulge, ultimately, if it ruptures, of course, it's an event that's usually fatal. But the aneurysm and the swelling in the artery is something that can be discerned by the appropriate diagnostic procedure.

48

Is there an appropriate analogy there, in the sense that, is there a way of anticipating, as you would with an aneurysm, its existence and its increase in size, such that you can reasonably anticipate the likelihood of a rupture? Do you have that kind of ability, through examination, to determine the enlargement of the blood vessels through the retina, leading to the ultimate rupture and blindness?

DR. BECK:        That's a really good analogy. No, we do not have that technology, we don't have that ability. I remember back in medical school and during my general surgery internship I think it was a five-centimeter abdominal aortic aneurysm, at the time, that was the cutoff for when someone would get surgery versus observation. It's not like that with the retina. This is — in my practice, that's what I was talking about the Amsler grid sending a patient home with this.

It's a grid with a bunch of straight lines on it, they put it on the refrigerator and test each eye. There will be a wavy spot or wavy area, well, that's their baseline, and if they notice a change in this, then, I have the patient call me and I will see them back right away. But there's no five-centimeter rule in the retina like that.

THE COURT:      So, again, if Mr. Balter had been seen, within the 10-week, give or take, 10 days that, originally, Dr. Tuller had requested, back on August 28, that examination, in your view, would not have disclosed any indication that a retinal bleed was imminent, is that right?

DR. BECK:        Correct.

The COURT:       . . . I've heard references to injections of Kenalog, Avastin and Lucentis. What do they do?

DR. BECK:        They attack the blood vessels.

THE COURT:      Pardon me. They're not preventative?

49

DR. BECK:      No, they're not preventative. What causes problems in the retina, whether diabetic retinopathy or wet macular degeneration, is the production of vascular endothelial growth factor, the growth factor that causes formation of new blood vessels. We don't like new blood vessels. They bleed, they leak, we don't want new blood vessels in the retina. New blood vessels are bad.

All of these medications revolve around blocking the receptors for the production of vascular endothelial growth factors, so they attack the blood vessel.

(*See id.* at 51:18-54:2).

266.    Dr. Beck testified that when Mr. Balter received treatment for past leakage, such treatments were effective in preventing the leakage from advancing to a substantially more harmful stage. (*Id.* at 35:3-6).

267.    Dr. Beck testified that he does not only provide injections to patients with massive hemorrhages, but that injections are used to treat patients when there was activity that required a response. (*Id.* at 43:7-12).

268.    Dr. Beck further testified that, hypothetically, if he had seen Mr. Balter within the recommended ten week follow-up window, and if during that follow-up he had noticed an increase in activity, he would have treated Mr. Balter in some manner. (*Id.* at 46:14-21).

## III. Applicable Law

### A.  Jurisdiction

Mr. Balter's claim of negligence against the Government is brought under the FTCA, 28 U.S.C. §§ 1346, 2671, *et seq.* The FTCA "provides much-needed relief to those suffering

injury from the negligence of government employees," *United States v. Muniz*, 374 U.S.

150, 165, 83 S.Ct. 1850, 1859, 10 L.Ed.2d 805 (1963), by "remov[ing] sovereign immunity of

the United States from suits in tort, and with certain specific exceptions, to render the

Government liable in tort as a private individual would be under like circumstances." *Podlog*

*v. United States*, 205 F. Supp. 2d 346, 355 (M.D. Pa. 2002), *aff'd*, 85 F. App'x 873 (3d Cir.

2003) (quoting *Richards v. United States*, 369 U.S. 1, 6, 82 S.Ct. 585, 589, 7 L.Ed.2d 492

(1962)). In FTCA claims, courts must "apply the law of the state in which the act or omission

occurred." *Hodge v. United States Dep't of Justice*, 372 F. App'x 264, 267 (3d Cir. 2010)

(citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000)). Because all of

the conduct giving rise to Mr. Balter's claim occurred at USP Allenwood, Pennsylvania state

law will apply.

## B. Ordinary versus Professional Negligence

Under Pennsylvania law, "[f]or a party to prevail in a negligence action, ordinary or

professional, the elements are identical: the plaintiff must establish [1] the defendant owed a

duty of care to the plaintiff, [2] that duty was breached, [3] the breach resulted in the

plaintiff's injury, and [4] the plaintiff suffered an actual loss or damages." *Merlini ex rel.*

*Merlini v. Gallitzin Water Auth.*, 602 Pa. 346, 354, 980 A.2d 502, 506 (Pa. 2009). Although

the basic elements of both ordinary and professional negligence are the same, a medical

malpractice claim is further defined as an "unwarranted departure from generally accepted

standards of medical practice resulting in injury to a patient, including all liability-producing

conduct arising from the rendition of professional medical services." *Id.* (quoting *Grossman*

*v. Barke*, 868 A.2d 561, 566 (Pa.Super.Ct. 2005)).

To determine whether a plaintiff's claim is one of ordinary or professional negligence,

courts must look to the substance, rather than the form, of the complaint. *Id.* at 507; *see*

*also Varner v. Classic Communities Corp.*, 890 A.2d 1068, 1074 (Pa.Super.Ct. 2006)

(stating "that it is the substance of the complaint rather than its form which controls whether

[a] claim . . . sounds in ordinary negligence or professional malpractice"). In *Merlini*, the

Pennsylvania Supreme Court stated that whether a negligence claim is "professional versus

ordinary negligence deals primarily with the breach of a professional standard of care."

*Merlini*, 980 A.2d at 507. The Pennsylvania Superior Court distinguished medical

malpractice from ordinary negligence as follows:

> A medical malpractice claim is distinguished by two defining characteristics.
> First, medical malpractice can occur only within the course of a professional
> relationship. Second, claims of medical malpractice necessarily raise
> questions involving medical judgment. Claims of ordinary negligence, by
> contrast, raise issues that are within the common knowledge and experience
> of the [fact-finder]. Therefore, a court must ask two fundamental questions in
> determining whether a claim sounds in ordinary negligence or medical
> malpractice: (1) whether the claim pertains to an action that occurred within
> the course of a professional relationship; and (2) whether the claim raises
> questions of medical judgment beyond the realm of common knowledge and
> experience. If both these questions are answered in the affirmative, the action
> is subject to the procedural and substantive requirements that govern medical
> malpractice actions.

*Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 322 (Pa.Super.Ct.2007) (quoting *Grossman*, 868

A.2d at 570).

In sum, "a complaint 'sounds in malpractice' where 'the conduct at issue constituted an integral part of the process of rendering medical treatment.'" *Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007) (quoting *Ditch*, 917 A.2d at 323). Because the conduct giving rise to Mr. Balter's claim involves alleged administrative failures rather than medical malpractice, the Complaint sounds in ordinary negligence and Mr. Balter's claim will be treated as such.

## C. Duty

Under 18 U.S.C. § 4042(a), the United States has a duty to "provide for the safekeeping, care and subsistence" and "for the protection . . . of all persons charged with or convicted of offenses against the United States." *Jones v. United States*, 91 F.3d 623, 624 (3d Cir. 1996) (quoting 18 U.S.C. § 4042(a)(2)-(3)). "The duty of care as provided by 18 U.S.C. § 4042 is that of ordinary diligence to keep prisoners safe from harm." *Grundowski v. United States*, 2012 WL 1721781, at *5 (M.D. Pa. 2012) (quoting *Hossic v. United States*, 682 F.Supp. 23, 25 (M.D .Pa. 1987) (internal quotation marks omitted)). This duty of care is heightened where an inmate is known to have a rare condition requiring special treatment. *See Berman v. United States,* 205 F. Supp. 2d 362, 365 (M.D. Pa. 2002) ("[I]t must be pointed out that plaintiff was not a run-of-the-mill prison patient with the usual complaints—he had a rare condition and, thus, prison officials should have been more alert to, and concerned with, the type of treatment he required.").

Because Mr. Balter was incarcerated at USP Allenwood and "was not a run-of-the-mill prison patient with the usual complaints," the Government owed a heightened duty to provide for the safekeeping, care, and protection of Balter. *See id.* By extension, MDI also owed Mr. Balter a duty of care pursuant to its contract with FCC Allenwood.[1]

## D. Breach

"Courts of the Third Circuit, in limited circumstances, have recognized that certain acts or omissions by prison medical staff can constitute a breach of an ordinary negligence duty." *Grundowski*, 2012 WL 1721781, at \*6; *see also id.* at \*10 (finding that the government breached its duty of care by failing to reasonably treat a plaintiff-inmates' diabetes); *Jones*, 91 F.3d at 625 (holding that the denial of an inmate's prescribed medication can constitute a breach of care under 18 U.S.C. § 4042); *Hill v. Lamanna*, 2006 WL 2433773, at \*9 (W.D. Pa. 2006) (finding possible breach of duty of care related to a plaintiff-inmate's tooth extraction).  More specifically, a prison may breach its duty of care by failing to schedule an inmate for necessary medical treatment in a timely fashion. *See Aviles v. United States*, 2012 WL 3562370, at \*6 (E.D. Pa. 2012).

## E. Causation

The third element Balter must prove is that the Government's negligence caused his injury. *See Grundowski*, 2012 WL 1721781, at \*6. "In limited circumstances, Pennsylvania

---

[1] Although it is an undisputed fact that MDI was contractually obligated "to provide scheduling services for USP" by finding outside "medical providers and/or physicians in the area of FCC Allenwood to provide care to inmates," (CSF at ¶¶ 17, 38), the contract itself was not incorporated into the record.

law permits recovery where a defendant's negligence increased the risk of harm to a plaintiff, even if plaintiff cannot show conclusively that no injury would have occurred in the absence of negligence." *Id.* at *7 (quoting *Lempke v. Osmose Util. Servs., Inc.*, 2012 WL 94497, at *3 (W.D. Pa. 2012)). When a plaintiff proceeds under a theory of increased risk, Pennsylvania law requires a two-stage inquiry. *See Hamil v. Bashline*, 481 Pa. 256, 269, 392 A.2d 1280, 1287 (Pa. 1978). First, a court must determine whether "a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position," and then "it becomes a question for the [fact-finder] whether that increased risk was a [factual cause] in producing the harm." *Feeney v. Disston Manor Pers. Care Home, Inc.*, 849 A.2d 590, 595 (Pa.Super.Ct. 2004).

## Increased Risk

Where the issue of increased risk involves questions of medical causation that go "beyond the knowledge of the average layperson," the plaintiff is required to present expert testimony, "with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained." *Vicari v. Spiegel*, 936 A.2d 503, 510 (Pa. Super.Ct. 2007), *aff'd*, 605 Pa. 381, 989 A.2d 1277 (Pa. 2010) (internal citations and quotation marks omitted). "In determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety." *Id.* "The purpose of this standard is not, however, to render proof needlessly difficult, but to avoid

speculation under the rubric of 'expert opinion.'" *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1258 (Pa.Super.Ct. 2008).

"That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty." *Id.* (quoting *Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa.Super.Ct. 2004)). "Accordingly, an expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words, 'reasonable degree of medical certainty.'" *Id.* (quoting *Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139 (Pa. 2000) (indicating that "experts are not required to use 'magic words'" but, rather, "[courts] must look to the substance of [the expert's] testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation")).

## Factual Cause

Once a plaintiff demonstrates increased risk of harm to a reasonable degree of medical certainty, then the case may be submitted to the finder of fact to determine whether the increased risk of harm was a "factual cause" of the injury. *Grundowski*, 2012 WL 1721781, at \*6-7 n.5 (quoting *Gorman v. Costello*, 929 A.2d 1208, 1213 n. 7 (Pa.Super.Ct. 2007) (noting that "[t]he term 'factual cause' has been adopted to replace the previously-used terms 'substantial factor' and 'legal cause'")); *see also* Pa. SSJI (Civ), § 13.20, Subcomm. Note.[2] During this second stage, the "factual cause" standard is intended to be a

---

[2] All of the jury instruction notes are from the Fourth Edition.

"relaxed standard." *Mitzelfelt v. Kamrin*, 526 Pa. 54, 67, 584 A.2d 888, 894 (Pa. 1990). To demonstrate factual cause, "a plaintiff is not required to show, to a reasonable degree of medical certainty, that the acts or omissions of the physician *actually* caused the harm to the plaintiff." *Qeisi v. Patel*, 2007 WL 527445, at *9 (E.D. Pa. 2007). Instead, "[t]o be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm." *Grundowski*, 2012 WL 1721781, at *6 (citing Pa. SSJI (Civ), § 13.20); *see also Gorman*, 929 A.2d at 1212-13 (quoting same).

However, "the defendant's conduct need not be the only factual cause. The fact that some other causes concur with [the defendant's] negligence in producing an injury does not relieve [the defendant] from liability as long as [his] [her] own negligence is a factual cause of the injury." Pa. SSJI (Civ), § 13.20. "When a defendant's negligent conduct combines with [other circumstances] [conduct of other persons] the defendant is legally responsible if his or her negligent conduct was one of the factual causes of the harm." Pa. SSJI (Civ), § 13.150.

Moreover, a "defendant is not relieved from liability because another concurring cause is also responsible for producing injury. If a jury could reasonably believe that a defendant's actions were a factual cause in bringing about harm, then the fact that there is a concurrent cause does not relieve the defendant of liability." Pa. SSJI (Civ), § 13.150 Subcomm. Note; *see also Mitzelfelt,* 584 A.2d at 894 (noting that a "defendant cannot escape liability

because there was a statistical probability that the harm could have resulted without negligence"); *Jones v. Montefiore Hosp.*, 494 Pa. 410, 416, 431 A.2d 920, 923 (Pa. 1981) (stating that a plaintiff "need not exclude every possible explanation and the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence"). Where a plaintiff's negligence claim involves an aggravation of a preexisting condition, "one can recover for an injury regardless of whether there exists a preexisting physical or mental condition as long as one can show that [negligence] was a [factual cause] in bringing about the aggravation of the condition." *Yosuf v. United States*, 642 F. Supp. 415, 430 (M.D. Pa. 1986) (citing *Boushell v. J.H. Beers*, 258 A.2d 682 (Pa.Super.Ct. 1969); *Hamil*, 392 A.2d at 1285).

### E. Damages

"The final element a plaintiff must demonstrate to prevail on a negligence claim is that the breach of a legal duty caused the plaintiff to suffer harm." *Grundowski*, 2012 WL 1721781, at *7 (citing *Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 588, 910 A.2d 20, 28 (Pa. 2006)). "Thus, the plaintiff must have incurred actual loss or damage." *Id.* (internal quotation marks, alterations, and citations omitted).

## IV. Analysis

Because the Court has already determined that the Government and MDI each owed Mr. Balter a duty of care, (*see supra* Part III.C), the primary remaining issues are: (A)

whether the Government and/or MDI breached their duty of care by delaying Mr. Balter's medical treatment in contravention of Dr. Tuller's order that Mr. Balter be seen within ten weeks for a follow-up; (B) whether the Government breached its duty of care by failing to arrange for Mr. Balter to be seen at USP Allenwood by one of the two optometrists who came to USP Allenwood on November 7, 14 and 22, 2007; (C) if the Government and/or MDI breached their duty of care, whether the Government and/or MDI increased the risk of Mr. Balter's harm; and (D) if the Government and/or MDI increased the risk of Mr. Balter's harm, whether the Government and/or MDI's negligence was a factual case of Mr. Balter's harm; and (E) if the Government and/or MDI's negligence caused Mr. Balter's harm, whether Mr. Balter is entitled to damages.

As a preliminary matter, "it must be pointed out that [Mr. Balter] was not a run-of-the-mill prison patient with the usual complaints—he had a rare condition and, thus, prison officials [and MDI] should have been more alert to, and concerned with, the type of treatment he required." See Berman, 205 F. Supp. 2d at 365. This fact is relevant in resolving all of the above-identified issues.

### F. Failure to Timely Schedule Ophthalmologist Appointment

The testimony provided by prison officials, as well as treating medical personnel, indicates that prison officials acted, together with MDI, in an inexcusable and unjustifiable manner when they did not timely schedule Mr. Balter for a follow-up appointment in accordance with Dr. Tuller's instructions.

## The Government

The Court finds the testimony of Ms. Auman, Ms. Rey and Ms. DeWald to be less-than-credible given the seemingly evasive answers they provided during their appearances. The Court is particularly troubled that no prison official involved in the scheduling of inmates with outside medical care, including the three just named, could explain why Mr. Balter was not seen in a timely fashion. (See CSF at ¶ 156; Trial Tr., Laino, Day 1, at 127:11-16; Trial Tr., Auman, Day 1, at 181:23-182:4; Trial Tr., DeWald, Day 2, at 9:21-22). All parties agree that Mr. Balter should have been seen within the ten weeks provided by Dr. Tuller's directive and that, at the very most, an additional grace period of seven to ten days, i.e. to November 16, 2007, would have been acceptable. (Cf. CSF at ¶¶ 26, 181, 205). The Court is concerned by the inability, or unwillingness, of anyone at the prison to provide any reason whatsoever for the failure to have Mr. Balter evaluated in a timely manner.

The Court finds it incomprehensible that Ms. DeWald "does not recall any conversations Mr. Balter claims to have had with her, except one time when he wanted to see an optometrist and she checked and he was scheduled." (Id. at ¶ 96). This is especially the case since Balter appears to have been the lone prisoner among the prison population at USP Allenwood to be blind in one eye and losing sight in the other as a result of wet macular degeneration—a condition for which he had been fairly continuously treated during his incarceration. (See Trial Tr., Balter, Day 1, 25:12-14; Trial Dep. Tr., Tuller, Doc. 139, Pl.'s Ex. 37, at 31:2-10). The Court is disturbed by Ms. DeWald's apparent nonchalance

with regard to Mr. Balter's treatment, and is similarly unimpressed by her inability to provide any explanation for the delay in scheduling Mr. Balter's follow-up. (Trial Tr., DeWald, Day 2, at 17:17-18:1). Ms. DeWald's testimony is telling in that she can offer no reason as to why it took over seven weeks to create an OSR for Mr. Balter with MDI. (*See id.* at 9:21-22). This is particularly true given that Ms. DeWald was unable to point to a single separate instance where the time to create an OSR for another inmate was similarly as long. (*See id.* at 9:23-25).

Even Dr. Brady, Clinical Director at USP Allenwood, could offer no explanation as to why it took from August 28, 2007 to October 16, 2007, or 49 days, "to get from the consultation sheet step to being referred offsite to be scheduled." (*See* CSF at ¶ 156). It appears that no official from the prison is able to offer any explanation whatsoever as to why Mr. Balter was not timely scheduled for a follow-up or seen by an optometrist on site in November of 2007. (Trial Tr., Laino, Day 1, at 127:11-16; Trial Tr., Auman, Day 1, at 185:15-186:11, 170:4-8, 155:5-9; Trial Tr., DeWald, Day 2, at 9:21-22). Such a failure is unjustifiable, given the duty of care owed by the Government to Mr. Balter.

In sum, the Government breached its duty of care in failing to ensure that Mr. Balter was timely scheduled for his follow up appointment with Dr. Tuller.

## MDI

The Government's negligence—in failing to create an OSR for over seven weeks and failing to ensure that Mr. Balter was scheduled in accordance with Dr. Tuller's order—

was compounded by MDI's failure to schedule Mr. Balter's appointment in accordance with

the OSR. It is undisputed that:

(1)   in 2007, "MDI had a contract with FCC Allenwood to provide scheduling services for USP Allenwood," (CSF at ¶ 38);

(2)   "[u]nder the contract with FCC Allenwood, it was MDI's responsibility to find medical providers and/or physicians in the area of FCC Allenwood to provide care to inmates," (id. at ¶ 17);

(3)   Lisa Rey, Medical Records Technician at USP Allenwood, (CSF at ¶ 70), submitted an OSR with Dr. Tuller's medical record from Mr. Balter's August 28, 2007 appointment to MDI on October 16, 2007, (id. at ¶ 23);

(4)   the OSR had "the one month box checked indicating that USP Allenwood wanted the appointment within a one month time frame," (id. at ¶ 24);

(5)   the "one month begins to run from the day the OSR is submitted to MDI," so "USP Allenwood wanted Mr. Balter's appointment scheduled on or before November 16, 2007," (id. at ¶¶ 25-26);

(6)   "MDI did not schedule [Mr. Balter's] appointment until 20 days later on November 5, 2007," (id. at ¶ 36); and

(7)   MDI scheduled the appointment for December 11, 2007, which "would be outside of the timeframe requested by USP Allenwood," (id. at ¶¶ 34-35).

Based on these undisputed facts, it is clear that MDI violated its responsibilities

under its contract with FCC Allenwood. No MDI representative testified at trial to defend

MDI's failure to timely schedule Mr. Balter.  However, it is an undisputed fact that

"[a]ccording to Laurie Zeller, Director of contract services for MDI, Richard Balter's

appointment with Dr. Tuller was not scheduled promptly by MDI." (Id. at ¶ 36).

In sum, MDI breached its duty of care in failing to timely schedule Mr. Balter's follow-up appointment with Dr. Tuller.

## G. Failure to Schedule Optometrist Appointment

### The Government

There is also a complete failure by the Government to justify, defend or even attempt to explain why Mr. Balter was not seen by an optometrist when Drs. DeRose or Weyand visited the prison on November 7, November 14, and November 22, 2007. (See Trial Tr., Balter, Day 1, at 90:2-6). Mr. Balter was not seen by an optometrist in November 2007, (Auman June 4, 2008 Note, Doc. 139, Pl.'s Ex 2), despite the fact that Mr. Balter was previously placed on the automatic call-out list, (CSF at ¶ 338), and despite the fact that Dr. DeRose ordered that Mr. Balter was to have his IOP tested every month by an optometrist, (id. at ¶ 318). With regard to Mr. Balter's removal from the automatic call out list, the record clearly indicates that Mr. Balter was previously placed on the automatic call out list, (see id. at ¶ 338), and that prior to November 2007 was seen regularly by an optometrist, (see id. at ¶ 322). There is no question that he was no longer on the list as of November 2007, (see Trial Tr., Balter, Day 1, at 90:2-6), that Drs. DeRose and Weyand visited the prison on three occasions in November 2007 and that Mr. Balter was not scheduled to see either of them, (Auman June 4, 2008 Note, Doc. 139, Pl.'s Ex 2).

With regard to Dr. DeRose's order to have Mr. Balter's IOP tested monthly, it is undisputed that "[a]s of . . . September 26, 2007," Dr. DeRose's medical records indicate

that Mr. Balter was to have his "IOP [checked] every month and need[ed] a retinal specialist

on a regular basis. In other words, routine follow up." (CSF at ¶ 318). When asked to

explain why "Dr. DeRose's request to check [Mr. Balter's] IOP every month . . . would not

have . . . been complied with," Ms. DeWald responded, "I cannot." (Trial Tr., DeWald, Day 2,

at 29:24-30:2, 31:9-11). Similarly, Ms. Auman acknowledged Dr. DeRose's order to have

Mr. Balter's IOP checked every month and stated, "I don't know why he wasn't seen." (Trial

Tr., Auman, Day 1, at 185:15-186:11, 170:4-8).[3]

The Government utterly failed to explain why Mr. Balter was not seen by an

optometrist on November 7, November 14, and November 22, 2007. The Court does not

find Ms. Auman's testimony on this subject credible given her inability to recall any facts

pertinent to this case. Specifically, the Court is troubled by her inability to remember if Mr.

Balter was on the automatic call out list or why Mr. Balter may have been removed from

such a list. (See, e.g., id. at 159-161, 169-170). It is difficult to believe that the person

responsible for maintaining this list would not have any recollection of Mr. Balter's status

given the seriousness of his condition, the rarity of that condition within the inmate

population at Allenwood and the frequency with which he had previously visited Drs.

DeRose and Weyand.

---

[3] The Government posits that "it's possible" that the reason Dr. DeRose's order to have Mr. Balter's IOP checked monthly was not followed is because Dr. DeRose subsequently gave an undocumented oral order negating his previous order. This "possible" explanation is purely speculation and not one offered by Ms. DeWald or Ms. Auman.

64

In sum, the Government breached its duty of care in failing to ensure that Mr. Balter was scheduled to see Dr. DeRose or Dr. Weyand when they visited USP Allenwood on November 7, November 14, or November 22, 2007.

## H. Increased Risk

In limited circumstances—circumstances where "irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm," Mitzelfelt, 584 A.2d at 892—"Pennsylvania law permits recovery where a defendant's negligence increased the risk of harm to a plaintiff, even if plaintiff cannot show conclusively that no injury would have occurred in the absence of negligence." Grundowski, 2012 WL 1721781, at *7 (internal quotation marks removed); see also Vicari, 936 A.2d at 512 ("Of course it is impossible to determine if, had Mrs. Vicari undergone chemotherapy, she would have had 'a disease free interval and large survival life' . . . . However . . . all that Plaintiff needs to establish is that the defendants' conduct increased the risk of harm."). Here, it is undisputed that because of the negligence of the Government and MDI and the nature of wet macular degeneration, it is impossible for Mr. Balter to conclusively show that he would have not suffered a massive hemorrhage absent the Government's negligence. (See Trial Tr., Goren, Day 2, at 151:1-11). Moreover, it is clear that even if Mr. Balter received timely medical care, a certain

percentage of patients in his position would have lost their vision. (*Id*. at 127:22-128:1; *see also* CSF at ¶ 180). Therefore, Mr. Balter must proceed under a theory of increased risk.[4]

When a plaintiff proceeds under a theory of increased risk, Pennsylvania law requires a two-stage process. *See Hamil*, 392 A.2d at 1287. First, a plaintiff must present expert testimony, "with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained." *Vicari*, 936 A.2d at 510. Whether the Government and/or MDI's negligence increased the risk of Mr. Balter's hemorrhage and resultant vision loss ultimately turns on whether the December 5, 2007 hemorrhage was the result of: (1) a sudden, unpredictable hemorrhage that was entirely independent of any previous leakage, as the Government asserts; or (2) a preexisting leak which eventually ruptured, as Mr. Balter contends.

As Dr. Goren acknowledged, it is impossible to say "with 100 percent certainty" whether Mr. Balter would not have suffered the December 5, 2007 hemorrhage if he was seen within the prescribed ten week period. (Trial Tr., Goren, Day 2, at 151:1-11). Although Dr. Goren testified that had Dr. Tuller "seen [Mr. Balter] in 10 weeks or 12 weeks, I think it's very likely that he would have seen additional leakage and would have treated him," (*id*. at 131:21-23), we will never definitively know what would have been found if Mr. Balter was examined in the month prior to December 5, 2007.

---

[4] The fact that Mr. Balter's claim is one of ordinary negligence does not preclude him from proceeding under a theory of increased risk. *See Grundowski*, 2012 WL 1721781, at *18-19 (applying increased risk theory of causation to ordinary negligence action under the FTCA); *see also Fenney*, 849 A.2d at 594 (same, in a non-FTCA ordinary negligence action).

Indeed, it is impossible to know whether there was ongoing and/or increasing leakage between October 17 and December 5—and this impossibility is a direct result of the Government's and MDI's negligence. Had Mr. Balter been seen by Dr. Tuller within the prescribed ten week period or by Drs. DeRose or Weyand when they were at the prison on November 7, 14, and 22, medical records would have documented whether Mr. Balter's macular degeneration remained stable or whether there was evidence of ongoing or increased leakage. Indeed, the very examination of Balter conducted by Dr. DeRose on December 5, 2007, by which he identified the hemorrhage in Balter's left eye and on the basis of which Balter was sent to the ophthalmologist, Dr. Lightman, that same day, could have been done on November 7, 14 or 22 by Dr. DeRose (or Dr. Weyand). If the examination had been done on one of those earlier dates, it could reasonably be expected to have led to referral to Drs. Tuller or Lightman at a time when medical efforts could have been made to avoid the hemorrhage.

Although the Government and MDI's negligence rendered definitive proof impossible, other factors were offered as evidence of when Mr. Balter's eye began to bleed. First, significant portions of trial testimony were devoted to the issue of whether Mr. Balter complained about leakage in his left eye in the month prior to December 5, 2007. Mr. Balter testified that during this period he complained to everyone in the prison who could help him. (Trial Tr., Balter, Day 1, at 70:12-71:5). According to Mr. Balter, he did everything he could

67

do to been seen by an optometrist or ophthalmologist "short of going to the SHU." (Id. at 50:9-15).

The Government contests the credibility of Mr. Balter's complaints, arguing that Mr. Balter did not complain about leakage in November 2007, because he did not notice a decrease in his vision until December 5, 2007. (See id. at 89:12-16). Moreover, during the cross-examination of Mr. Balter, the Government cast some doubt on the credibility of his alleged complaints. (See id. at 71-89). The Court finds that Balter did make complaints about leakage in his left eye, as he indisputably had done in the past. Nonetheless, the Court does not need to resolve this credibility issue to determine that the leak in Balter's left eye pre-dated the December 5, 2007 hemorrhage. The Court need not decide whether such complaints were made as described by Balter because, as demonstrated in the remainder of this section, infra, the Court finds that the Government's negligence inexcusably increased the risk of Mr. Balter's harm even absent such complaints.[5]

A second source of evidence as to when Mr. Balter started experiencing leakage is the fundus photograph of Mr. Balter's eye that was taken during his emergency appointment with Dr. Lightman on December 5, 2007. (See Trial Dep. Tr., Lightman, Doc. 139, Pl.'s Ex. 39, at 23:15-24:3). Drs. Lightman and Goren both testified that based on the photograph alone one "couldn't pinpoint a time" when the bleed began. (Id. at 24:4-7; Trial Tr., Goren,

---

[5] If Mr. Balter was complaining during this period, then, given the nature of wet macular degeneration, there would be no doubt that the Government's negligence increased the risk of Mr. Balter's harm. (See Trial Tr., Goren, Day 2, at 130:1-9).

Day 2, at 107:19-22). However, both doctors indicated that, as Dr. Goren stated, "[t]here are some features of [the fundus photograph] that suggests that this blood may have been here for a little while." (Trial Tr., Goren, Day 2, at 107:23-24). Dr. Lightman testified that the photograph shows "a dark area of blood and it's surrounding a more tan area. And the tan area . . . looks like [it] has probably been there for a matter of weeks . . . ." (Trial Dep. Tr., Lightman, Doc. 139, Pl.'s Ex. 39, at 24:15-20). Dr. Lightman further explained that blood gets lighter over time "because the blood dehemoglobinizes." (*See id.*). Dr. Goren largely agreed with Dr. Lightman's analysis concluding that based on the photograph it is "unlikely" Mr. Balter's bleed began on December 5, 2007. (Trial Tr., Goren, Day 2, at 108:6-7).

The final factor that the parties' experts considered was Mr. Balter's overall medical history. It is undisputed that Mr. Balter had a "persistent leakage" predating his December 5, 2007 hemorrhage. (*See id.* at 107:19-22; Trial Tr., Beck, Day 3, at 24:14-25:10). In light of this preexisting leakage, Dr. Goren concluded that had Mr. Balter been examined in the month prior to December 5, 2007, as he should have been, it is "very likely" that additional leakage would have been found and that Mr. Balter would have been treated. (*See* Trial Tr., Goren, Day 2, at 131:21-23). When challenged on cross-examination, Dr. Goren stated:

> You're saying . . . ["]how can you say that he had [pre-existing] leakage then[?"], but I would posit, how could you say that he didn't? That would be the only time, over a period of six or seven years, that he didn't have leakage. I don't think there's any question that there was an ongoing problem with leakage. . . .

I think it's completely unreasonable . . . [considering Mr. Balter's] history[,] to assume that, all of a sudden, he had a completely brand new event that was unrelated to what was going on over the past 7 or 8 years.

(*Id.* at 134:11-16, 142:23-143:2).

Based on the totality of these factors, Dr. Goren testified that because Mr. Balter likely experienced leakage prior to the December 5, 2007 hemorrhage, there was a "period of intervention where there was an opportunity to treat." (*Id.* at 145:14-17). Because Mr. Balter was not examined during this period, Dr. Goren opined that Mr. Balter lost an opportunity to prevent the December 5, 2007 hemorrhage. (*Id.* at 145:18-20). As a result, although he could not "say with certainty" that Mr. Balter would have avoided the hemorrhage if he had been properly monitored, Dr. Goren concluded that "the failure to have the requested follow-up increased the risk of harm to Mr. Balter." (*Id.* at 151:3-11, 152:2-9).[6]

Dr. Beck reached a contrary conclusion. According to Dr. Beck, Mr. Balter's December 5, 2007 leak was "most likely within a reasonable degree of medical certainty, a sudden onset." (*See* Trial Tr., Beck, Day 3, at 16:23-17:2). As a result, Beck testified that the fact that Mr. Balter was not seen in November 2007 "ha[d] no bearing" on his suffering a loss of central vision. (*See id.* at 18:15-16). However, Dr. Beck did acknowledge, hypothetically, that if Mr. Balter had been seen within the recommended ten week follow-up

---

[6] Dr. Goren testified that all of the opinions that he expressed at trial were to a reasonable degree of medical certainty. (*See* Trial Tr., Goren, Day 2, at 127:4-6). Based on the totality of Dr. Goren's testimony, the Court finds that Dr. Goren provided expert testimony to "a reasonable degree of medical certainty" that the Government and MDI negligence increased the risk of Mr. Balter's harm. *Cf. Vicari*, 936 A.2d at 510.

window, and if during that follow-up he had noticed an increase in activity, he would have treated Mr. Balter in some manner. (See id. at 46:19-21).

Taking all of the medical testimony into consideration, the Court finds that had Mr. Balter been seen by Dr. Tuller no later than November 16, 2007, or during one of the routine visits to the prison by the independent optometrists on November 7, 14 and 22, 2007, there is sufficient evidence upon which to find, to a reasonable degree of medical certainty, that active leakage could have been detected by such an earlier examination. In particular, the Court is persuaded by Dr. Lightman's testimony that the fundus photograph he ordered on December 5, 2007 indicates that the hemorrhage Mr. Balter suffered had been leaking "for a matter of weeks." (Trial Dep. Tr., Lightman, Doc. 139, Pl.'s Ex. 39, at 24:15-20). Moreover, the Court agrees with Dr. Goren that in light of the Mr. Balter's history of persistent leakage and the recent activity he had experienced, "it's completely unreasonable . . . to assume that, all of a sudden, [Mr. Balter] had a completely brand new event that was unrelated to what was going on over the past 7 or 8 years." (See Trial Tr., Goren, Day 2, at 142:23-143:2).

In sum, the Government's and MDI's failure to permit doctors to timely examine and monitor Mr. Balter undoubtedly increased the chance of a catastrophic hemorrhage.

## I. Factual Cause

"Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was

71

in fact sustained, it becomes a question for the [fact-finder] as to whether or not that increased risk was a [factual cause of ] . . . the harm." *Hamil*, 392 A.2d at 1286. The finder of fact is permitted, but not required, "to find that the conduct which gave rise to an increased risk was the legal cause of a plaintiff-patient's injuries." *Corrigan v. Methodist Hosp.*, 234 F. Supp. 2d 494, 501 (E.D. Pa. 2002) (citing *Clayton v. Sabeh*, 594 A.2d 365, 367 (Pa.Super.Ct 1991)).

At this second stage of the increased-risk analysis, a plaintiff is not required to show that the defendant's negligence "*actually* caused the harm to the plaintiff." *Qeisi*, 2007 WL 527445, at *9 (citing *Mitzelfelt*, 584 A.2d at 894). Instead, Courts apply a "relaxed standard," *Mitzelfelt*, 584 A.2d at 894, requiring only that a plaintiff prove that the defendant's act or omissions were "an actual, real factor in causing the harm" as opposed to "an imaginary or fanciful factor having no connection or only an insignificant connection with the harm," *Grundowski*, 2012 WL 1721781, at *6.

The key factual inquiry for the Court to resolve at this stage is whether the Government's and MDI's negligence, which led to Mr. Balter's macular degeneration going unmonitored by an ophthalmologist for 97 days (between August 28 and December 5, 2007), and by an optometrist for 49 days (between October 17 and December 5, 2007) played more than an inconsequential or marginal role in causing the December 5, 2007 hemorrhage.

72

According to Dr. Beck, "the fact that [Mr. Balter] wasn't seen in November had no bearing on the outcome here." (*See* Trial Tr., Beck, Day 3, at 18:15-26). Dr. Beck opined that even if Mr. Balter was examined in a timely fashion and leakage was found, it is unlikely that Mr. Balter would have received an injection as his leakage would have probably been stable. (*See id.* at 18:15-19:4). However, the Court has already found (1) that Mr. Balter's eye was leaking prior to December 5, 2007 and (2) that Mr. Balter's December 5 hemorrhage was related to this preexisting leakage. As a result, the Court concurs with Dr. Goren's conclusion that had Mr. Balter been scheduled for a follow-up with Drs. Tuller and Lightman in a timely fashion, they would have discovered leakage that would have prompted treatment prior to December 5, 2007. (*See* Trial Tr., Goren, Day 2, at 109:17-110:12, 141:19-142:4). Likewise, had Balter been examined by Drs. DeRose or Weyand on November 7, 14 or 22, 2007, as he should have been and as he had consistently been in the past, the condition of Balter's eye could have been assessed with specific reference to the identification of any increase in leakage or outright bleed in the eye.

Second, Dr. Beck opined that even if Mr. Balter received an injection during the month of November 2007, it would not have prevented his December 5, 2007 hemorrhage. (*See* Trial Tr., Beck, Day 3, at 43:13-18). Dr. Beck testified that hemorrhages are unpredictable, (*id.* at 10:24-11:7, 20:7-9), and injections are not preventive, (*id.* at 11:20-12:9). As a result, Dr. Beck concluded that Mr. Balter's vision loss was not the result of the

prison negligence but the inevitable, natural progression of his disease. (*See id.* at 10:11-14, 22:2-15).

However, Dr. Beck's fatalistic conclusions run contrary to Mr. Balter's medical history. As Dr. Goren explained, "the natural progression of [Mr. Balter's] disease was being altered by his treatment. The natural progress of that disease . . . with no treatment would have meant that he probably would have been blind back in 2001, but he was getting appropriate treatment through this period of time." (Trial Tr., Goren, Day 2, at 135:3-7, 110:12, 144:22-145:6). During his cross-examination, Dr. Beck clarified that being diagnosed with wet macular degeneration does not necessarily entail going blind. (Trial Tr., Beck, Day 3, at 45:10-13). He stated that with timely treatment "there are a lot of cases where people [with wet macular degeneration] can preserve" their vision. (*Id.* at 45:23-46:2).

In Mr. Balter's case, Dr. Beck agreed that Mr. Balter's vision "remained fairly stable" prior to August 2007. (*Id.* at 28:16-22). As a result of timely treatment between 2003 and 2007, Mr. Balter experienced what Dr. Goren called "smoldering leaks." (Trial Tr., Goren, Day 2, at 137:9-10). In other words, during this time period, Mr. Balter had an ongoing problem with leakage, (*id.* at 129:13-23), where his macular degeneration would periodically flare up, leading to leakage in his left eye and, on several occasions, requiring injections. (*See* Trial Dep. Tr., Tuller, Doc. 139, Pl.'s Ex. 37, at 58:1-21). Dr. Tuller explained that "treatment [with injections] is geared toward causing these [leaking] vessels to regress and reduce the risk of hemorrhage." (*Id.* at 75:2-6). For Mr. Balter, it is undisputed that he had "a

history of responding nicely" to injections of vascular endothelial growth factor inhibitors (intravitreal Kenalog) between 2003 and 2007. (*Id.* at 74:11-16; Trial Tr., Beck, Day 3, at 46:3-7, 81:19-22, 82:19-21; *see also* Pl.'s Mar. 20, 2007 Med. R., Doc. 140, Def.'s Ex. 1, at 52).

Although past outcomes do not ensure future results, it is reasonable to conclude, as Dr. Goren does, that had Mr. Balter been afforded an opportunity to be examined and treated between November 4 and December 5, 2007, he "would have had a far better chance of a favorable outcome." (Trial Tr., Goren, Day 2, at 145:14-24, 151:9-10). By arguing that Mr. Balter's vision loss was unpreventable and unrelated to the Government and MDI's negligence, the Government essentially contends that it was a coincidence that Mr. Balter's hemorrhage occurred when it did. According to the Government, it was entirely coincidental that Mr. Balter was able to maintain 20/50 to 20/60 vision during the several years during which he received timely medical care, and it was equally coincidental that Mr. Balter suffered a massive hemorrhage with resulting blindness after several weeks of not receiving regular medical monitoring and treatment. The Court would have to ignore far too much evidence in the record, particularly with respect to the history of Balter's macular degeneration and the results of the treatment accorded him, to find that the blindness he sustained in his left eye as a result of the hemorrhage found on December 5, 2007, was no more than coincidental to the lapse of treatment that occurred in the period beginning August 28, 2007.

While it is impossible to know with certainty that the Government and/or MDI's

negligence *actually caused* Mr. Balter's December 5, 2007 hemorrhage, (*see id*. at 151:3-

11), such certitude is not required under Pennsylvania law. *See, e.g.*, *Qeisi*, 2007 WL

527445, at *9; *see also Mitzelfelt*, 584 A.2d at 894; *Vicari*, 936 A.2d at 512. Rather, Mr.

Balter must prove by a preponderance of the evidence that the prison's negligence was "an

actual, real factor in causing the harm" rather than "an imaginary or fanciful" one. *See*

*Grundowski*, 2012 WL 1721781, at *6. In light of circumstances surrounding the

Government and MDI's negligence—Mr. Balter's medical history and, in particular, the fact

that he had responded so well to injections in the past that he was able to maintain his

vision during the time period in which he received them, (*see* Trial Dep. Tr., Tuller, Doc.

139, Pl.'s Ex. 37, at 74:11-16)—Mr. Balter has proven that the Government and MDI's

negligence was "an actual, real factor in causing" the December 5, 2007 hemorrhage and

his resultant vision loss.

In sum, the Court finds that the Government and MDI's negligence is a factual cause

of Mr. Balter's catastrophic hemorrhage of December 5, 2007.

## V. **Conclusions of Law**

1.      In FTCA claims, courts must "apply the law of the state in which the act or

omission occurred." *Hodge v. United States Dep't of Justice*, 372 F. App'x 264, 267 (3d Cir.

2010) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000)). Because

all of the conduct giving rise to Mr. Balter's claim occurred at USP Allenwood, Pennsylvania, state law will apply.

2.      Under Pennsylvania law, "[f]or a party to prevail in a negligence action, ordinary or professional, the elements are identical: the plaintiff must establish [1] the defendant owed a duty of care to the plaintiff, [2] that duty was breached, [3] the breach resulted in the plaintiff's injury, and [4] the plaintiff suffered an actual loss or damages." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 602 Pa. 346, 354, 980 A.2d 502, 506 (Pa. 2009).

3.      To determine whether a plaintiff's claim is one of ordinary or professional negligence, courts must look to the substance, rather than the form, of the complaint. *Merlini*, 980 A.2d at 507; *see also Varner v. Classic Communities Corp.*, 890 A.2d 1068, 1074 (Pa.Super.Ct. 2006) (stating "that it is the substance of the complaint rather than its form which controls whether [a] claim . . . sounds in ordinary negligence or professional malpractice").

4.      Because the conduct giving rise to Mr. Balter's claim involves alleged administrative failures rather than medical malpractice, the Complaint sounds in ordinary negligence.

5.      Under 18 U.S.C. § 4042(a), the United States has a duty to "provide for the safekeeping, care and subsistence" and to "provide for the protection . . . of all persons charged with or convicted of offenses against the United States." *Jones v. United States*, 91 F.3d 623,

77

624 (3d Cir. 1996) (quoting 18 U.S.C. § 4042(a)(2)-(3)). "The duty of care as provided by 18 U.S.C. § 4042 is that of ordinary diligence to keep prisoners safe from harm." *Grundowski v. United States*, 2012 WL 1721781, at *5 (M.D. Pa. 2012) (quoting *Hossic v. United States*, 682 F.Supp. 23, 25 (M.D. Pa. 1987) (internal quotation marks omitted)).

6.      This duty is heightened where an inmate is known to have a rare condition requiring special treatment. *See Berman v. United States*, 205 F. Supp. 2d 362, 365 (M.D. Pa. 2002) ("[I]t must be pointed out that plaintiff was not a run-of-the-mill prison patient with the usual complaints—he had a rare condition and, thus, prison officials should have been more alert to, and concerned with, the type of treatment he required.").

7.      Because Mr. Balter was incarcerated at USP Allenwood and "was not a run-of-the-mill prison patient with the usual complaints," the Government owed a heightened duty to provide for the safekeeping, care, and protection of Balter. *See id.* By extension, MDI also owed Mr. Balter a duty of care pursuant to its contract with FCC Allenwood.[7]

8.      "Courts of the Third Circuit, in limited circumstances, have recognized that certain acts or omissions by prison medical staff can constitute a breach of an ordinary negligence duty." *Grundowski*, 2012 WL 1721781, at *6; *see also Jones*, 91 F.3d at 625 (holding that the denial of an inmate's prescribed medication can constitute a breach of care under 18 U.S.C. § 4042).

---

[7] MDI's duties of care are stated with the qualifications mentioned in note 1, *supra*.

9.      Denial of access to medical treatment by medical staff can constitute ordinary negligence. *See Hill v. Lamanna*, 2006 WL 2433773, at \*9 (W.D. Pa. 2006).

10.      A prison may breach its duty of care by failing to schedule an inmate for necessary medical treatment in a timely fashion. *See Aviles v. United States*, 2012 WL 3562370, at \*6 (E.D. Pa. 2012).

11.      Balter must prove that the Government's negligence caused his injury. *See Grundowski*, 2012 WL 1721781, at \*6. In limited circumstances, Pennsylvania law "permits recovery where a defendant's negligence increased the risk of harm to a plaintiff, even if plaintiff cannot show conclusively that no injury would have occurred in the absence of negligence." *Id.* at \*7 (quoting *Lempke v. Osmose Util. Servs., Inc.*, 2012 WL 94497, at \*3 (W.D. Pa. 2012)).

12.      When a plaintiff proceeds under a theory of increased risk, Pennsylvania law requires a two-stage inquiry. *See Hamil v. Bashline*, 481 Pa. 256, 269, 392 A.2d 1280, 1287 (Pa. 1978). First, a court must determine whether "a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position," and then "it becomes a question for the [fact-finder] whether that increased risk was a [factual cause] in producing the harm." *Feeney v. Disston Manor Pers. Care Home, Inc.*, 849 A.2d 590, 595 (Pa.Super.Ct. 2004).

13.      Where the issue of increased risk involves questions of medical causation that go "beyond the knowledge of the average layperson," the plaintiff is required to present

expert testimony, "with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained." *Vicari v. Spiegel*, 936 A.2d 503, 510 (Pa.Super.Ct. 2007), *aff'd*, 605 Pa. 381, 989 A.2d 1277 (2010) (internal citations and quotations omitted).

14.     "That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty." *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1259 (Pa.Super.Ct. 2008) (quoting *Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa.Super.Ct. 2004)).

15.     "Accordingly, an expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words, 'reasonable degree of medical certainty.'" *Id.* (quoting *Commonwealth v. Spotz*, 562 Pa. 498, 537, 756 A.2d 1139, 1160 (Pa. 2000) (indicating that "experts are not required to use 'magic words'" but, rather, "[courts] must look to the substance of [the expert's] testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation")).

16.     Once a plaintiff demonstrates increased risk of harm to a reasonable degree of medical certainty, then the case may be submitted to the finder of fact to determine whether the increased risk of harm was a "factual cause" of the injury. *Grundowski*, 2012 WL 1721781, at *6-7 n.5 (noting that "[t]he term 'factual cause' has been adopted to replace the previously-used terms 'substantial factor' and 'legal cause'") (citing *Gorman v. Costello*,

929 A.2d 1208, 1213 n. 7 (Pa.Super.2007)); *see also* Pa. SSJI (Civ), § 13.20, Subcomm. Note.

17. The "factual cause" standard is intended to be a "relaxed standard." *Mitzelfelt, v. Kamrin*, 526 Pa. 54, 67, 584 A.2d 888, 894 (Pa. 1990). To demonstrate factual cause, "a plaintiff is not required to show, to a reasonable degree of medical certainty, that the acts or omissions of the physician *actually* caused the harm to the plaintiff." *Qeisi v. Patel*, 2007 WL 527445, at *9 (E.D. Pa. 2007). Instead, "[t]o be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm." *Grundowski*, 2012 WL 1721781, at *6 (quoting Pa. SSJI (Civ), § 13.20); *see also Gorman*, 929 A.2d at 1212-13 (same).

18. "[The defendant's] conduct need not be the only factual cause. The fact that some other causes concur with [defendant's] negligence in producing an injury does not relieve [defendant] from liability as long as [his] [her] own negligence is a factual cause of the injury." Pa. SSJI (Civ), § 13.20. "Where the negligent conduct of a defendant combines with [other circumstances] [conduct of other persons], the defendant is legally responsible if his or her negligent conduct was one of the factual causes of the harm." Pa. SSJI (Civ), § 13.150.

19. "A defendant cannot escape liability because there was a statistical probability that the harm could have resulted without negligence. The fact that some cause

concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence." *Mitzelfelt*, 584 A.2d at 894 (internal quotation marks and citation omitted); *see also Jones v. Montefiore Hosp.*, 494 Pa. 410, 416, 431 A.2d 920, 923 (1981) (stating that a plaintiff "need not exclude every possible explanation and the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence") (internal quotation marks and citation omitted).

20.     Where a plaintiff's negligence claim involves an aggravation of a preexisting condition, "one can recover for an injury regardless of whether there exists a preexisting physical or mental condition as long as one can show that [negligence] was a [factual cause] in bringing about the aggravation of the condition." *Yosuf v. United States*, 642 F. Supp. 415, 430-31 (M.D. Pa. 1986) (citing *Boushell v. J.H. Beers*, 215 Pa.Super. 439, 258 A.2d 682 (Pa.Super.Ct. 1969); *Hamil*, 392 A.2d at 1285).

21.     "The final element a plaintiff must demonstrate to prevail on a negligence claim is that the breach of a legal duty caused the plaintiff to suffer harm." *Grundowski*, 2012 WL 1721781, at *7 (citing *Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 588, 910 A.2d 20, 28 (Pa. 2006)). "Thus, the plaintiff [must have] incurred actual loss or damage." *Id.* (quoting *Phillips v. Cricket Lighters*, 576 Pa. 644, 658, 841 A.2d 1000, 1008 (Pa. 2003)).

22.     The testimony provided by prison officials, as well as treating medical personnel, indicates that prison officials acted, together with MDI, in an inexcusable and unjustifiable manner when they did not timely schedule Mr. Balter for a follow-up appointment in accordance with Dr. Tuller's instructions.

23.     The Government breached its duty of care in failing to ensure that Mr. Balter was timely scheduled for his follow up appointment with Dr. Tuller.

24.     The Government's negligence—in failing to create an OSR for over seven weeks and failing to ensure that Mr. Balter was scheduled in accordance with Dr. Tuller's order—was compounded by MDI's failure to schedule Mr. Balter's appointment in accordance with the OSR.

25.     MDI violated its responsibilities under its contract with FCC Allenwood. No MDI representative testified at trial to defend MDI's failure to timely schedule Mr. Balter. However, it is an undisputed fact that "[a]ccording to Laurie Zeller, Director of contract services for MDI, Richard Balter's appointment with Dr. Tuller was not scheduled promptly by MDI." (CSF at ¶ 36).

26.     MDI breached its duty of care in failing to timely schedule Mr. Balter's follow-up appointment with Dr. Tuller.

27.     The Government breached its duty of care in failing to ensure that Mr. Balter was scheduled to see Dr. DeRose or Dr. Weyand when they visited USP Allenwood on November 7, November 14, or November 22, 2007.

28.     The Government's and MDI's failure to permit doctors to timely examine and

monitor Mr. Balter increased the chance of a catastrophic hemorrhage.

29.     Mr. Balter has proven that the Government and MDI's negligence was "an

actual, real factor in causing" the December 5, 2007 hemorrhage and his resultant vision

loss. *Cf. Grundowski*, 2012 WL 1721781, at *6.

30.     The Court finds that the Government and MDI's negligence is a factual cause

of Mr. Balter's catastrophic hemorrhage of December 5, 2007.

### J. Damages

In assessing damages in this case, we begin with a proposition recognized by both

the Plaintiff and the Government:

> The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, governs all
> claims against the United States for monetary damages, for injury or loss of
> personal property or personal injury or death caused by the negligent [*sic*],
> wrongful act, or omission of any employee of the United States while acting
> within the scope of his office or employment.

(Pl.'s Brief in Supp. of Claim for Damages, Doc. 145, at 2 (citing 28 U.S.C. 2675(a)); *see*

*also* Def.'s Brief in Opp. to Pl.'s Claim for Damages, Doc. 146, at 2 (same)).

Further, the FTCA provides:

> The United States shall be liable, respecting the provisions of this title
> relating to tort claims, in the same manner and to the same extent as a
> private individual under like circumstances, but shall not be liable for interest
> prior to judgment or for punitive damages.

28 U.S.C. § 2674.

Further, the parties to this suit agree that the United States cannot be held responsible for any negligence found to have been committed by its contractor, MDI. Thus, the Government, in its Brief in Opposition to Plaintiff's Claim for Damages, relying upon the definition set forth in the FTCA of the term "federal agency" and the express exclusion from that definition of "any contractor with the United States," asserts that "[b]ecause the United States has not waived its immunity, it cannot be sued for the negligent acts committed by an independent contractor." (Doc. 146 at 3 (citing *United States v. Orleans,* 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976)). The Government further argues that, for it "to be liable for the negligence of an employee of the independent contractor, [that person] must be shown to be an 'employee of the Government' as that term is used in the Federal Tort Claims Act." (*Id.* at 3). Citing *Logue v. United States,* 412 U.S. 521, 531-532 (1973), the Government argues that, under the FTCA, "only MDI can be liable to the Plaintiff for failing to schedule Plaintiff for a follow-up appointment in accordance with the OSR submitted by the BOP." (Doc. 146 at 7).

In a later Brief concerning damages Plaintiff recognizes that "[t]he FTCA expressly excludes a contractor under the definition of 'federal agency.'" (Doc. 152 at 4 (citing 28 U.S.C. § 2671)). Plaintiff thus acknowledges: "The United States can be held liable for its own negligence or the negligence of an employee; but cannot be held liable for the negligence of an independent contractor." (*Id.* at 4-5 (citing *Logue, supra*)). The Court also

recognizes this controlling principle and, accordingly, the United States shall not be held liable for the negligence of MDI.

This statement, however, does not serve to end the inquiry with respect to the failure to timely schedule Balter for an ophthalmologist appointment. This is so because the record evidence establishes that the scheduling of an inmate such as Balter required the fulfillment by the Government and MDI of separate but inter-dependent obligations. As previously noted herein, all parties agree that Mr. Balter should have been seen within the 10 weeks provided by Dr. Tuller's directive and that, at the very most, an additional grace period of 10 days, i.e., to November 16, 2007, would have been acceptable. (*See* CSF at ¶¶ 181, 205). Yet, USP Allenwood, although receiving Dr. Tuller's request for a follow-up appointment for Mr. Balter on August 28, 2007 waited until October 16, 2007, or 49 days, to generate the OSR and to submit it to MDI. (*See* Findings of Fact, Part II, *supra*, at ¶¶ 160-172). This delay was entirely unexplained by the Government. (*See id.* at ¶¶ 168-172). "Dr. Brady does not know why it took from August 28, 2007, the day of the consultation sheet, until October 16, 2007, to get from the consultation sheet step to being referred offsite to be scheduled." (CSF at ¶ 156). "Mr. Laino further testified that such a lengthy time frame to schedule an appointment is unusual." (Findings of Fact, Part II, *supra*, at ¶ 170). "Likewise, AHSA Ms. DeWald testified that she did not know why it took over seven weeks to create an OSR for Mr. Balter with MDI. Moreover, she could think of no other instance in which such a

86

time period elapsed while attempting to schedule other prisoners." (*Id.* at ¶ 172). As the

Court has further stated:

> The October 16, 2007 OSR submitted by USP Allenwood to MDI had the one month box checked indicating that USP Allenwood wanted the appointment within a one-month time frame. The one-month time frame began to run from the day the OSR was submitted to MDI. This meant that USP Allenwood wanted Mr. Balter's appointment scheduled on or before November 16, 2007.

(*Id.* at ¶ 161).

Nonetheless, as a result of the unexcused and unjustifiable 49-day delay in the

submission by USP Allenwood to MDI of the OSR for a period 49 days, the Government's

negligent failure operates to impose liability upon it for its negligent and unreasonable delay

in submitting the OSR request for Mr. Balter to MDI.

Once MDI received the OSR on October 16, 2007, it was to schedule Richard

Balter's appointment with Dr. Tuller promptly. But it did not do so. (*See id.* at ¶ 162

("According to Laurie Zeller, Director of contract services for MDI, Richard Balter's

appointment with Dr. Tuller was not scheduled promptly by MDI[,] where MDI was provided

with the OSR on October 16, 2007, and MDI did not schedule the appointment until 20 days

later on November 5, 2007.")). This is in marked contrast to Mr. Balter's appointment of

August 28, 2007, which was created on August 14, 2007. (*Id.* at ¶ 155). Thus, it is

undisputed that Lisa Rey, Medical Records Technician at USP Allenwood submitted an

OSR with Dr. Tuller's medical record from Mr. Balter's August 28, 2007 appointment to MDI

on October 16, 2007. (*See* CSF at ¶ 23).

87

MDI did not comply with the OSR's directive which, as discussed above, indicated that USP Allenwood wanted the appointment within a one-month time frame. Instead, MDI did not schedule Mr. Balter's appointment until 20 days later on November 5, 2007, (*id.* at ¶ 36), and when MDI finally did schedule Balter's appointment on that date, it scheduled the appointment for December 11, 2007, which was outside of the time frame requested by USP Allenwood, (*id.* at ¶¶ 35-36). MDI, by the admission of its Director of Contract Services, Laurie Zeller, failed to schedule Richard Balter's appointment with Dr. Tuller promptly. The final December 11 appointment date was 25 days after the latest date which would have been within the time period prescribed by Dr. Tuller for Mr. Balter's follow-up appointment. Thus, MDI's delay of 20 days in scheduling the appointment and its scheduling of the appointment 25 days after the last date which would have been acceptable shows it to be responsible for a 65-day delay in the scheduling of Mr. Balter's appointment.

In assessing damages for the harm sustained by Mr. Balter, the parties agree that he is not entitled to past, present or future lost wages or past or future medical expenses. (Doc 145 at 3; Doc. 146 at 7). However, Plaintiff does claim damages for loss of vision, past, present and future loss of life's pleasures; past, present and future pain and suffering; mental anguish, upset, humiliation and embarrassment; and any other damages permitted by law. (Doc. 145 at 3).

As Plaintiff points out, he is serving a life sentence without parole. (*Id.*) Mr. Balter's life imprisonment requires this Court to assess damages in light of Balter's peculiar

circumstances and to calibrate the calculation of damages to recognize the effect of his

blindness on his daily life as a prisoner. In this vein, the "medical/surgical and psychiatric

referral request submitted as Exhibit B to Plaintiff's Brief in support of its claim for damages

contains the Federal Bureau of Prison's Statement, updated as of February 13, 2012:

> Inmate Balter has no usable vision; he is particularly vulnerable to injury, assault, or victimization by other inmates.
>
> Personal
>
> ●Unable to use washing machine and dryer independently.
> ●Unable to see medications, cannot take medications independently. Must depend on having someone else tell him what his medication cards contain. High risk for medication error/overdose.
> ●Unable to order requested items for commissary independently or verify that he has received items ordered.
> ●Unable to use computer independently.
>
> Housekeeping
>
> ●Unable to clean cell independently.
> ●When cell is searched items are moved from original location and he is unable to find them.
> ●Unable to use combination lock provided to secure personal property.
>
> Mobility
>
> ●Uses various other inmates to assist him with ambulation. None of these inmates have been assigned to him, nor have they been trained in working with a blind individual.
> ●Unable to move independently from building to building.
> ●Unable to move independently throughout housing unit.
> ●Cannot see tables in food service in order to put food tray down.
> ●Cannot see obstacles in his path when walking, runs into low lying objects repeatedly.
> ●With no usable vision has hit head repeatedly on upper bunk with resulting lacerations/abrasions to head.
> ●Unable to see other people around him.
> ○Cannot avoid running into people.

  ○ Cannot avoid walking into areas that are not safe (incidents on yard)
  ● Unable to exercise (walking) for health maintenance.

  Due to inmate Balter's extensive limitations, we feel he would best be suited
  for placement in a Medical Facility.

(Doc. 152, Ex. B, at 2-3).

  Earlier in this Bureau of Prison's document, it is noted with respect to Balter:

  On June 23, 2011, the optometrist evaluated inmate Balter, and provided a
  diagnosis of wet macular degeneration of both eyes. The optometrist
  indicated 24-hour care was needed, as inmate Balter has no depth
  perception while walking, he requires an escort to do all mobile activities, he
  is unable to read, write, and see to eat. He has no functional vision at
  distance. He also has lost his peripheral vision in both eyes.

(Id. at 2).

  Balter's own testimony is in complete accord with the Bureau of Prison's

observations above. When asked to describe "what an average day is like" for him, Balter

testified:

  It's terrible. I live in a cell with another individual, unable to defend myself if
  there's a confrontation. I can't clean the room. As far as using the facilities,
  sometimes you miss going to the bathroom. You're always dropping things
  and don't know where they are and you can't find them and you're
  dependent upon someone to help you, and if someone isn't in the room, you
  have to find someone who has a good enough heart to help you.

  Any type of hygiene is hard because you have to put everything in an exact
  place so you remember where it is in the institutions. They have what's
  called a shake-down, and staff members go through your locker that they
  give you and move things all over the place, and I've got to get people to
  come in and help me try to re-locate it.

  I can't secure any of my personal items and a lot of them are missing,
  because I don't have a lock that I can utilize. When I go out of the unit or

when I go anywhere in the unit, I've learned how to count steps wherever I am, so that I know at the institution where I am. It's 21 steps to the right against the wall to the shower, to the ice machine is 18, there's 17 steps to walk down. The railings on both sides are, etc., etc. To get a little exercise, I walk on the upper tier holding on to a railing to guide myself.

Downstairs there's tables, TV's mounted up where individuals play their cards and their games and the computer and everything else that I can't use and all their chairs and seats are there, so I can't function at that level because I trip over things and bump into them. There's a lot of inmates that don't know that you're blind and they take as, Where are you going? And it could cause a confrontation.

Anywhere I go in an institution, I have to have an escort with me to help me. I have trouble making my bed, filling the requirements of the normal inmate. I have to have people get my tray of food, tell me where the food is on it, and then eating it, trying to locate it, I have to taste it to see if I can eat it. I can't see anything I'm eating or have to ask people to get drinks for me and everything else. And not all inmates are willing to do those things.

I can't utilize the library, I can't do any reading, and there's nowhere that I have any facility that can help me with anything educationally. I can't do anything religiously, I can't see to do it. I can't go to the recreation yard and have any kind of recreation, because, in the institution where I am, more than others is what they would say is a gang-infested arena for gladiators. It's about 98 per cent gang-infested.

Q.    Where is that?

A.    Beaumont, it's a medium facility, Texas. There are more lockdowns than anything else. And functioning is a daily nightmare, because you have to wonder if someone is going to get annoyed, you never know when something is coming, you are constantly walking into things and tripping over things. A lot of other people are unaware. You can't use a cane for the blind because there's so many people around, you end up hitting them with the cane.

Leaving the unit, there's four units together, on any move, there's at least 300 people coming out at once, and I either get knocked over or trampled, it's a

91

nightmare trying to live in the conditions where I am. And there's really not much that they can do medically, especially, at the facility where I am. . . ."

(Trial Tr., Balter, Day 1, at 65:1-66:11).

The Court notes that Balter was rendered legally blind in his right eye in 1997 as a result of macular degeneration. The Court further notes that the negligence of the United States and MDI affected Balter's vision in his left eye only. Yet the venerable principle that the Court must take the Plaintiff as it finds him has application here. The reality is that the negligence of the United States and MDI have placed Balter in the position where his term of life imprisonment has been made almost immeasurably worse. He is, by his blindness, subject to daily, if not constant, predation; he has lost the ability to read, write, eat without assistance and generally, to take care of the most basic of human functions, including caring for oneself.

Since the Court finds that Richard Balter bears no responsibility for the delays which were occasioned by the negligence of USP Allenwood and MDI, as explained herein, in fulfilling their separate but inter-dependent responsibilities to him, the Court finds no comparative negligence percentage should be assessed against Richard Balter.[8] Thus, the Court awards the Plaintiff the sum of $250,000.00 for the failures of USP Allenwood and MDI to timely schedule his appointment with Dr. Tuller and apportions responsibility for the

---

[8] Nor does the Court find that Vitreoretinal Associates or Drs. Tuller and Lightman, partners in VRA, were negligent.

harm caused to him by the separate negligent conduct of MDI and the United States as follows:

| MDI | United States |
|-----|---------------|
| 50% | 50%. |

By Order filed November 1, 2013, this Court notified the parties that it "will issue a decision in accordance with Federal Rule of Civil Procedure 52 in which I will state the Court's Findings of Fact and, separately, its Conclusions of Law, and in which I will find in favor of the Plaintiff and against the Government and MDI." (Order of Nov. 1, 2013, Doc. 141 at, at 1). The Order then delineated the specific Findings that the Court would make with respect to the breach by the Government and by MDI of their respective duties of care owed to Balter. (*Id.* at 1-2). In that same Order, the parties were notified that the "issue of damages must now be resolved." (*Id.* at 2). Accordingly, the parties were directed to submit their positions with respect to the issues delineated by the Court which it deemed necessary for a determination of damages in this case. (*Id.* at 2-3.)

Plaintiff submitted his Brief in Support of his Claim for Damages and argued therein that with respect to the failure to timely schedule Balter in accordance with Dr. Tuller's request that Balter be seen within 10 weeks from August 28, 2007, requested that negligence as between the United States and MDI be apportioned as follows:

United States – 85%;       MDI – 15%.

(Doc. 145 at 8). Plaintiff further argued that no portion of negligence should be apportioned to him. (*Id.* at 11).

93

Plaintiff, in response to the Court's Order that he do so, addresses the applicability of the joint and several liability provisions of the Pennsylvania Comparative Negligence Statute, 42 Pa. CONS. STAT. ANN. § 7102(a)(1)-(2). (*See* Doc. 145 at 11-12). The Plaintiff, relying on *Kohn v. School District of City of Harrisburg*, 2012 WL 5379283, at \*7 (M.D. Pa. 2012), and on *Harris v. Kellogg Brown & Root Svs., Inc.*, 724 F.3d 458, 474 n.12 (3d Cir. 2013), asserts that because Plaintiff's cause of action accrued on or about December 5, 2007, the 2011 Amendments to Section 7102 made by Public Law 78, No. 17, were not applicable. (Doc. 145 at 13).

Plaintiff thus argues that the instant action is governed by the prior version of the Pennsylvania Comparative Negligence Statute, asserting: "'Pennsylvania law permits a plaintiff prevailing against multiple defendants for the same legal wrong to recover the full amount from any one defendant,' as long as the plaintiff is not barred from recovering against the other defendants." (*Id.* at 14) (quoting *Essex Ins. Co. v. Rayski, Inc.*, 2007 WL 1965537, at \*2 (E.D. Pa. 2007).

The Government, in its Brief in Opposition to Plaintiff's Claim for Damages, asserts that "[b]ecause the United States has not waived its immunity, it cannot be sued for the negligent acts committed by an independent contractor." (Doc. 146 at 3).

Alternatively, the Government argues that, even if the Court were to disagree with its assertion that the Government had no liability for the failures of its contractor, "MDI is nonetheless responsible for the lion's share of the damages." (*Id.* at 8).

The Government also argues that the Plaintiff himself bore responsibility in that he was "negligent for failing to report to sick call and requesting to be put on the list to see the optometrist as an add-on in November of 2007, and, in this regard, his negligence was greater than the negligence of the United States and/or the combined negligence of the Defendants." (Id. at 14).

In subsequent filings with this Court pursuant to the Court's Order of February 10, 2014 (Doc. 148), the Plaintiff, agreeing with the position of the government, wrote that "if MDI is determined to be a joint tortfeasor, the United States' liability is to be reduced by MDI's percentage of liability." (Doc. 152 at 3).

Further, the Plaintiff also acknowledged that "[t]he United States can be held liable for its own negligence or the negligence of an employee; but cannot be held liable for negligence of an independent contractor." (Id. at 4-5 (citing Logue, 412 U.S. 521)). The Government's response to this Court's Order of February 10, 2014, asserts the Government's position that based on the terms of the Pro-Rata Joint Tortfeasor Release entered into between Plaintiff and MDI, "the United States believes it is entitled to a pro-rata reduction for the percentage of liability apportioned to MDI as a result of this Court's determination that MDI was a tortfeasor based on the evidence presented at trial." (Doc. 150 at 2).

## VI. Conclusion

For the reasons set forth in this memorandum opinion, the Court finds in favor of Mr.

Balter and assesses a finding of liability against Defendants the United States and MDI.

Furthermore, there appears to be no dispute between the parties that: (1) the United

States may not be held liable for the negligence of a contractor, such as MDI; and (2)

where, as here, MDI has been determined to be a joint tortfeasor, the United States' liability

is to be reduced for the percentage of liability apportioned to MDI in this case. Thus, this

Court's award of $250,000.00 against the United States for the failures of USP Allenwood

and MDI to timely schedule Balter's appointment with Dr. Tuller shall be reduced by 50%, or

$125,000.00.

With respect to the failure of the United States to schedule an optometrist

appointment for Richard Balter in the month of November, 2007, the Court assesses

damages solely against the United States since MDI had no role in ensuring that Balter was

seen by the optometrists who visited the prison on November 7, November 14 and

November 22, 2007. Here again, the United States offered no explanation why Mr. Balter

was not seen by an optometrist on the aforesaid dates in November of 2007. This Court has

already found that Mr. Balter's eye was leaking prior to December 5, 2007 and that his

hemorrhage on that date was related to this pre-existing leakage. Had Balter been

examined by Drs. DeRose or Weyand on November 7, 14 or 22, 2007, as he should have

been and as he had been in the past, the condition of Balter's eye would have been

96

assessed and any increase in leakage or outright bleed in the eye would have been identified. This would have resulted in Mr. Balter being immediately sent to an outside ophthalmologist for treatment. Indeed, when Balter was finally seen by Dr. DeRose on December 5, DeRose identified the significant bleed or hemorrhage in Balter's left eye and Balter was immediately sent to Dr. Lightman, an ophthalmologist, outside of the facility, for treatment. This Court has found that the failure of the United States to have Mr. Balter examined by an optometrist was a factual cause of the massive hemorrhage sustained by Balter with resulting blindness in his left eye. It awards Mr. Balter the sum of $400,000.00 in damages against the United States.

Therefore, a verdict shall be entered in this case against the United States in the amount of $650,000.00, which shall be reduced by the sum of $125,000.00, which represents the percentage of negligence attributed to MDI in connection with the failures of the United States and MDI to timely schedule Balter's appointment as requested by Dr. Tuller; and which shall further be reduced by the off-set to which the United States is entitled for the restitution owed by Plaintiff in the amount of $112,511.00 in connection with his criminal conviction. Plaintiff acknowledges the Government's right to a set-off, acknowledging that "[t]he United States has the right to first off-set its lien – in this case for the amount of the outstanding restitution – prior to paying the judgment." (Doc. 145 at 15). Accordingly, judgment will be entered in favor of the Plaintiff and against the United States in the amount of $412,489.00.

Further, the Court will enter a verdict against MDI in the amount of $250,000.00, MDI having played no role whatsoever in the failure of the United States to arrange for Balter to be seen by the optometrist who visited the Prison on November 7, 14 and 22, 2007.

DATE: 4/7/14

Robert D. Mariani
United States District Judge